IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 93-7192

---

RICHARD HARE, Natural Father and Next
Friend of Haley Hare, a minor, ET AL.,

Plaintiff-Appellee,

versus

CITY OF CORINTH, MS, A municipal
corporation, ET AL.,

Defendants,

FRED JOHNSON, etc., BILLY BURNS, etc.,
JAMES DAMONS, etc., BRENDA MOORE, etc.,

Defendants-Appellants.

---

Appeal from the United States District Court
for the Northern District of Mississippi

---

January 29, 1996

Before POLITZ, Chief Judge, KING, GARWOOD, JOLLY, HIGGINBOTHAM,
DAVIS, JONES, SMITH, DUHÉ, WIENER, BARKSDALE, EMILIO M. GARZA,
DeMOSS, BENAVIDES, STEWART, PARKER, and DENNIS, Circuit Judges.

GARWOOD and HIGGINBOTHAM, Circuit Judges:

Today we again visit the measures of liability under the U.S.
Constitution for failing to prevent a suicide by a pretrial
detainee. Tina Hare committed suicide while detained in the city
jail in Corinth, Mississippi. Her husband, Richard Hare, sued
municipal and individual defendants under 42 U.S.C. § 1983. The
district court denied summary judgment. This appeal by individual
defendants claiming qualified immunity followed. A panel of this
court dismissed their appeal. We elected to hear the case en banc,

and now find that the district court applied an erroneous legal standard in denying summary judgment on qualified immunity grounds. We hold that the episodic act or omission of a state jail official does not violate a pretrial detainee's due process right to medical care or protection from suicide unless the official acted or failed to act with subjective deliberate indifference to the detainee's rights, as defined in Farmer v. Brennan, 114 S. Ct. 1970 (1994). We vacate and remand for review of the claims of qualified immunity under the correct legal standard.

## I.

Richard Hare sued the City of Corinth, the city's Board of Aldermen, Corinth Mayor Edward Bishop, former Corinth Mayor Jack Holt, and Police Captain Billy Burns, Police Chief Fred Johnson, Officer Brenda Moore, and Captain James Damons in their individual and official capacities. Mr. Hare sued under 42 U.S.C. § 1983, alleging violations of the Fourth, Fifth, Eighth, and Fourteenth Amendments of the U.S. Constitution, and of Mississippi's wrongful death statute. After discovery, Burns, Johnson, Moore, and Damons moved for summary judgment asserting qualified immunity. Mr. Hare in turn moved for summary judgment. The district court granted defendants summary judgment on Mr. Hare's state-law claims, but declined to enter judgment upon the § 1983 claims. It found that there were genuine issues of material fact as to whether Ms. Hare was deprived of rights protected under the Due Process Clause of

2

the Fourteenth Amendment. The district court also rejected Mr. Hare's cross-motion for summary judgment.

Those individual defendants claiming qualified immunity appealed the denial of their motion for summary judgment. A panel of this court dismissed the defendants' appeal. See Hare v. City of Corinth, 22 F.2d 612 (5th Cir. 1994). The panel found that Mr. Hare had alleged a violation of Ms. Hare's clearly established federal due process right to medical attention for her suicidal tendencies, and that there were genuine issues of material fact as to whether the defendants' inaction manifested deliberate indifference. The panel concluded that because the defendants' appeal presented "more than a pure question of law the denial of summary judgment [was] not appealable." Id. at 616.

On October 13, 1994, the panel substituted a revised opinion dismissing the appeal under a different analysis. Relying on Bell v. Wolfish, 441 U.S. 520 (1979), the panel concluded (1) that Ms. Hare had a clearly established due process right to reasonable care for her serious medical needs unless failure to supply such care was reasonably related to a legitimate governmental objective, and (2) that there were fact issues precluding summary judgment and rendering the denial of summary judgment not appealable. See Hare v. City of Corinth, 36 F.3d 412 (5th Cir. 1994).

II.

Viewing the summary judgment evidence most favorably to Mr. Hare, the following transpired:

3

Shortly after midnight on the morning of July 14, 1989, the Booneville Police Department notified the Corinth Police Department that Ms. Hare had been arrested in Booneville on warrants for petty larceny and forgery. Officer Larry Fuqua of the Corinth Police Department immediately went to Booneville to pick up Ms. Hare, at which time the Booneville police informed Fuqua that Ms. Hare was a "heavy drug user." Fuqua took Ms. Hare to the Corinth City Jail, where she was jailed at approximately 1:45 a.m.

Ms. Hare's husband, Mr. Hare, testified in his deposition that Ms. Hare called him just after she was jailed. Mr. Hare testified that his wife had never been in jail before, and that she seemed scared and frightened. Ms. Hare told her husband that nothing could be done to secure her release until after 8:00 a.m., so he went back to sleep. Later that morning, at around 6:00 a.m., Mr. Hare contacted Ms. Hare's divorced parents, Guy Taylor and Patricia Morgan, to inform them that their daughter was in the Corinth jail and needed help. Shortly thereafter, Mr. Hare met with Ms. Hare's parents; they decided that Ms. Hare's parents would go to the jail at 8:00 a.m. to seek their daughter's release, leaving Mr. Hare at home to care for the Hares' baby daughter. When Ms. Hare's parents went to the jail at around 8:00 a.m., however, Burns told them that Ms. Hare was not ready for release, and that it would take more time to complete the investigation of their daughter. Accordingly, Burns told the parents to return home and wait for his call.

In his deposition, Burns testified that he was informed that Ms. Hare was a suspect in a check forgery case, and that he first

4

met with Ms. Hare to interview her at approximately 10 a.m. on July 14, 1989.  During this interview, Ms. Hare told Burns that she had been forging checks and cashing them to finance her dilaudid addiction.  According to Burns, Ms. Hare was depressed about being in jail, and was sitting with both feet in her chair in a defensive, "fetal-type" position.  Ms. Hare said that she was an unfit mother and expressed concern about how her husband would react to her predicament.  Burns observed that Ms. Hare was going through withdrawal, which he understood to be a normal reaction to her drug use; he also learned at that time that Ms. Hare was scheduled to enter a drug rehabilitation program the next day, July 15, 1989, in Tupelo, Mississippi.  Burns indicated that Ms. Hare's mood improved later in the interview when she learned that her bond amount would not be as high as she initially had expected.

After the interview, Burns placed Ms. Hare in a private cell and told the dispatcher, Brenda Moore, to monitor Ms. Hare in case her withdrawal symptoms required medical attention.  Ms. Hare was allowed to call her parents to ask them to return to the jail to assist with her bond so that she could be released that afternoon.  These plans never materialized, apparently in part because of Burns' displeasure over Ms. Hare's attempt to destroy a videotape on which the interview had been recorded.[1]  Also, in the meantime, the Corinth police had received word of additional charges on Ms.

---

[1]Burns had been videotaping the interview, and at some point he left the room briefly.  When he returned, he discovered that Ms. Hare had substituted another tape for the one that was previously in the recorder.  The tape on which the interview had been recorded was found in a garbage can in damaged condition.

Hare. When Ms. Hare's parents arrived at the jail at around noon, Burns told them that Ms. Hare could not go home at that time.

Though Ms. Hare was not released, she was allowed to visit with her parents from around 2:00 p.m. to 3:00 p.m. During this private meeting, Ms. Hare's mother described Ms. Hare as "emotionally distraught." Burns likewise described Ms. Hare's mood as "hyper" and "frantic" while her parents were at the jail. Ms. Hare attempted to convince Burns not to hold her in jail another night and threatened to commit suicide if he did. While Burns did not consider the threat serious, Ms. Hare's father testified that he believed that she was serious, observing that she had made the suicide threat in a serious, believable tone of voice. Burns acknowledged that it was possible that Ms. Hare said to him that "her life was in his hands," but said that he could not specifically remember whether she said those words to him. In any event, Ms. Hare's threat prompted her father to seek assurance from Burns that Ms. Hare would be safe. Burns acknowledges telling Ms. Hare's father that the police would do "everything within [their] power to make sure that nothing did happen to her."

After Ms. Hare's parents left the jail, Burns returned Ms. Hare to her original cell. Burns subsequently moved her to an isolated cell nearest the camera monitors and trusty station, claiming that Police Chief Fred Johnson instructed him to do so. Johnson denies that he ever gave Burns such an instruction. Since Ms. Hare had been strip-searched previously, Burns searched her cell, took her shoes, and made sure that she did not have a belt.

Burns saw a blanket on the bunk and considered the possibility that Ms. Hare might use it to harm herself, but left it there believing that she was not strong enough to tear it. Burns instructed dispatcher Moore to keep a close check on Ms. Hare and to have the trusties check on her. According to Burns, his primary concern was Ms. Hare's "withdrawal syndrome," not her suicide threat.

Moore confirms that Burns told her to keep an eye on Ms. Hare, and that he also apprised her of Ms. Hare's threat to harm herself. Burns, however, believed that Moore would be on duty until 10:00 p.m, when in fact she was off duty at 5:00 p.m.. Moore thus went home at 5:00 p.m., at which time Captain James Damons took over her dispatching duties. Moore claims that she informed Damons that Burns had left instructions to keep an eye on Ms. Hare, though Damons denies receiving such information.

Burns left the station some time after 3:00 p.m. At around 6:00 p.m., Burns called the jail from his home and told Damons to have the two trusties check on Ms. Hare at least every forty-five minutes. Damons promptly sent a trusty to check on Ms. Hare. When the trusty arrived at Ms. Hare's cell, he found her hanging from the bars of her cell with a noose that she had fashioned from strips of the blanket. As the trusty did not have a key to Ms. Hare's cell, he immediately notified Damons. Damons, in accordance with jail procedures, could not leave his post, so he called Burns. Ms. Hare was left there hanging, though the summary judgment evidence does not establish whether she was alive or dead when the

7

trusty first found her. Burns told Damons to leave Ms. Hare undisturbed until the State Investigator arrived.

## III.

We first determine whether the district court's denial of the motion for summary judgment by the individual defendants asserting qualified immunity was immediately appealable under Mitchell v. Forsyth, 472 U.S. 511 (1985). After the panel issued its opinions in this case but before rehearing en banc, the Supreme Court addressed the appealability of a denial of summary judgment on qualified immunity grounds in Johnson v. Jones, 115 S. Ct. 2151 (1995). In Johnson, the plaintiff sued five police officers who had allegedly beaten him. Three of the officers claimed qualified immunity in their motion for summary judgment, arguing that there was no evidence that they were involved in the plaintiff's beating. The district court denied their summary judgment motion, and they appealed to the Seventh Circuit. The Seventh Circuit dismissed the officers' appeal, finding that it lacked appellate jurisdiction over such an "evidence insufficiency" contention. The Supreme Court affirmed the Seventh Circuit's dismissal, holding that a district court's summary judgment order, though entered in a qualified immunity case, is not appealable if it determines only a question of "evidence sufficiency." Id. at 2156.

In this case, the district court denied the summary judgment motion of the individual defendants after concluding that there were fact issues as to whether they knew or should have known of

8

Ms. Hare's suicide risk.  The individual defendants contend that, even conceding the facts as alleged by Mr. Hare, they are entitled to qualified immunity because their conduct did not violate any clearly established federal rights of which a reasonable officer would have known at the time of Ms. Hare's suicide.  The critical question is whether, given the demurrer to the plaintiff's facts, we have jurisdiction over this appeal.

We find that we do.  As we will explain, the district court applied the incorrect legal standard in denying summary judgment. We leave to the district court the question whether there are genuine issues of material fact measured by the correct standard. This appeal does not present the fact-intensive inquiry eschewed by Johnson.  Rather, it presents a legal issue antecedent to the determination of whether there are genuine issues of material fact. Our review of the legal issues in this appeal goes to the legal question of the correct legal standard.

IV.

In general, the State's incarceration of pretrial detainees and convicted state prisoners comports with due process guarantees because of the State's recognized interests in detaining defendants for trial and in punishing those who have been adjudged guilty of a crime.  The State's exercise of its power to hold detainees and prisoners, however, brings with it a responsibility under the U.S. Constitution to tend to essentials of their well-being:

> [W]hen the State by the affirmative exercise of its power
> so restrains an individual's liberty that it renders him

9

> unable to care for himself, and at the same time fails to provide for his basic human needs — e.g., food, clothing, shelter, medical care, and reasonable safety — it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.

DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 200 (1989) (citations omitted). Hence, since pretrial detainees and convicted state prisoners are similarly restricted in their ability to fend for themselves, the State owes a duty to both groups that effectively confers upon them a set of constitutional rights that fall under the Court's rubric of "basic human needs."

Pretrial detainees and convicted prisoners, however, look to different constitutional provisions for their respective rights to basic needs such as medical care and safety. The constitutional rights of a convicted state prisoner spring from the Eighth Amendment's prohibition on cruel and unusual punishment, see Estelle v. Gamble, 429 U.S. 97, 104 (1976), and, with a relatively limited reach, from substantive due process. The constitutional rights of a pretrial detainee, on the other hand, flow from both the procedural and substantive due process guarantees of the Fourteenth Amendment. See Bell v. Wolfish, 441 U.S. 520 (1979). Significantly, Bell instructs that the State must distinguish between pretrial detainees and convicted felons in one crucial respect: The State cannot punish a pretrial detainee. Id. at 535 ("In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against

10

deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee."). Since the State _does_ punish convicted prisoners, but _cannot_ punish pretrial detainees, a pretrial detainee's due process rights are said to be "at least as great as the Eighth Amendment protections available to a convicted prisoner." _City of Revere v. Massachusetts Gen. Hosp._, 463 U.S. 239, 244 (1983).

Much of the current confusion over the measures of the due process rights of pretrial detainees stems from the divergent ways in which lower courts have applied _Bell_. We start by revisiting _Bell_ and reviewing our cases construing _Bell_ to facilitate an understanding of the sources of difficulty.


A.

In _Bell_, pretrial detainees brought a constitutional challenge seeking injunctive relief against a number of jail conditions and restrictions, including the jail's practice of "double bunking" its detainees. The district court enjoined the challenged practices after concluding that they were not justified by a "compelling necessity." The Supreme Court expressly rejected this high level of scrutiny.

Then Justice Rehnquist began his opinion for the Court by emphasizing that "the Government has a substantial interest in ensuring that persons accused of crimes are available for trials and, ultimately, for service of their sentences, [and] that

11

confinement of such persons pending trial is a legitimate means of furthering that interest." Bell, 441 U.S. at 534. The Court recognized, however, that a pretrial detainee has a "right to be free from punishment [and] an understandable desire to be as comfortable as possible during his confinement, both of which may conceivably coalesce at some point." Id. The Court sought to fashion a test respecting both the Government's interests and the detainee's rights, a test designed to "determin[e] whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of that word." Id. at 538.

The Court lowered the level of scrutiny to one of rationality:

[I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a legitimate goal — if it is arbitrary or purposeless — a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees.

Id. at 539 (footnote omitted). Thus, under Bell, a pretrial detainee cannot be subjected to conditions or restrictions that are not reasonably related to a legitimate governmental purpose. An open question has remained: Given that both pretrial detainees and convicts have constitutional rights to basic human needs while incarcerated and therefore unable to fend for themselves, what standard applies when a pretrial detainee asserts a deprivation of a constitutional right held in common with convicted prisoners, albeit through a different textual source.

12

The Supreme Court, in clarifying the scope of convicted prisoners' Eighth Amendment rights, has consistently held that liability for inaction attaches only when a prison official's failure to act amounts to deliberate indifference to the prisoner's rights.  See, e.g., Farmer, 114 S. Ct. at 1977; Wilson v. Seiter, 111 S. Ct. 2321, 2327 (1991); Estelle v. Gamble, 429 U.S. at 104. The level of official conduct that must be shown to support a comparable claim by a pretrial detainee, however, is a question that the Court has repeatedly left open.  See, e.g., City of Canton v. Harris, 489 U.S. 378, 388 n.8 (1989); City of Revere, 463 U.S. at 244.

Our efforts to answer this question have reflected conflicting perspectives on whether to apply Bell or a deliberate indifference standard.  When dealing with a pretrial detainee's right to medical care or protection from harm, it is argued, we must apply the reasonable relationship test of Bell, since that test was designed specifically to define the scope of due process rights of pretrial detainees.  With equal fervor it is urged that the deliberate indifference standard applied in the Court's Eighth Amendment cases ought to be the choice, since those cases have addressed the specific type of right asserted in this case — the right to medical care or protection from harm.  As a review of our case law discloses, this tension has emerged from varied readings of the breadth of Bell and of cases applying it.

B.

In Jones v. Diamond, 636 F.2d 1364 (5th Cir. 1981) (en banc), overruled on other grounds, International Woodworkers of Am. v. Champion Int'l Corp., 790 F.2d 1174 (5th Cir. 1986) (en banc), we reviewed a constitutional challenge by both pretrial detainees and convicted prisoners seeking injunctive relief from a multitude of practices and conditions of their incarceration in a county jail. Judge Rubin's opinion for the en banc court carefully distinguished the rights of pretrial detainees from those of convicted inmates, relying on Bell in addressing the claims of the pretrial detainees. We held that "[t]he confinement of pretrial detainees indiscriminately with convicted persons is unconstitutional unless such a practice is `reasonably related to the institution's interest in maintaining jail security,' or physical facilities do not permit their separation." Jones, 636 F.2d at 1374 (quoting Bell, 441 U.S. at 540). Likewise, we held that contact visitation may be denied to pretrial detainees "if it is a restraint `reasonably related to the institution's interest in maintaining jail security.'" Id. at 1377 (quoting Bell, 441 U.S. at 540). As to medical attention, we noted:

> The standard by which to measure the medical attention that must be afforded pretrial detainees has never been spelled out. The Bell v. Wolfish criterion, applied to medical attention, entitles pretrial detainees to reasonable medical care unless the failure to supply it is reasonably related to a legitimate governmental objective.

Id. at 1378. Thus, the due process algorithm for deciding whether to grant injunctive relief in Jones was simple: We applied Bell

14

across the board, to all of the claims of the pretrial detainees, asking whether the challenged restriction was reasonably related to a legitimate governmental interest.

The apparent simplicity of the Bell formula belies the mischief that has emerged in our case law in the wake of Jones and its embrace of the reasonable-relationship inquiry. We have consistently recognized that pretrial detainees are entitled to protection from harm as well as needed medical care, but our case law has traveled divergent directions in deciding whether to apply the Bell test. Since Jones expressly declared that the right of a pretrial detainee to receive medical care was to be measured by the Bell test, it was easy for our cases to follow the perceived trajectory of Jones and conduct the reasonable relationship inquiry in all cases involving denials of reasonable medical care. In the case of failure-to-protect claims, however, the Jones analysis was less firm; while Jones applied Bell in asking whether pretrial detainees had to be separated from prisoners as a general matter of jail policy, it left open the question of how to analyze a claim based on an isolated failure to protect a pretrial detainee from violence at the hands of other pretrial detainees, or even at his own hands.

Stokes v. Delcambre, 710 F.2d 1120 (5th Cir. 1983), presented us with one of our first opportunities to consider the effect of Bell and Jones on the failure-to-protect claim of a pretrial detainee who was assaulted by fellow inmates. We found it unnecessary to "dwell on the difference in rights enjoyed by pre-

trial detainees and convicted persons," id. at 1124, noting that "all prison officials owe a constitutionally rooted duty to their prisoners to provide them reasonable protection from injury at the hands of their fellow prisoners," id. But while we explained in Stokes that the requirement of "reasonable protection" came directly from Jones, neither Stokes nor Jones explicitly adopted a reasonable protection standard. Rather, Stokes simply cited Jones for the proposition that a "failure to control or separate prisoners who endanger the physical safety of other prisoners can constitute cruel and unusual punishment." Stokes, 710 F.2d at 1124. We concluded that the jail was administered in such a manner as to be "virtually indifferent" to the safety of prisoners, emphasizing that the jury had found the defendants guilty of wanton conduct and had awarded punitive damages. Id. Hence, our holding in Stokes was based on a finding that the jailers' indifference to the detainee's injuries was sufficiently egregious to establish their liability for failing to protect the pretrial detainee from violence by other inmates.

In Johnston v. Lucas, 786 F.2d 1254 (5th Cir. 1986), we held that a convicted inmate could recover for a jailer's violation of his duty to protect only if the jailer acted with "conscious or callous indifference." Id. at 1259. Significantly, we held that the district court had erred in reading Stokes to measure the State's duty as one of "reasonable care." Id.. Our opinion in Johnston relied on Davidson v. Cannon, 474 U.S. 344, 348 (1986), in which the Supreme Court held that "the protections of the Due

16

Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials."

Johnston's application of Davidson and Whitley v. Albers, 475 U.S. 312 (1986), in shaping the legal measures for failure-to-protect claims became apparent in Alberti v. Klevenhagen, 790 F.2d 1220 (5th Cir. 1986). In Alberti, a class of convicted inmates and pretrial detainees challenged the conditions of a jail in which violence and sexual abuse were rampant. While noting that the due process rights of pretrial detainees under Bell generally exceed those of convicted inmates under the Eighth Amendment, we suggested that their respective rights to protection from harm were similar:

> Where dealing with the constitutionally rooted duty of jailers to provide their prisoners reasonable protection from injury at the hands of fellow inmates, "we need not dwell on the differences in rights enjoyed by pre-trial detainees and convicted prisoners or the maturation of prisoners' rights in general." The same conditions of violence and sexual abuse which constitute cruel and unusual punishment may also render the confinement of pretrial detainees punishment per se.

Id. at 1224 (quoting Stokes, 710 F.2d at 1124). Thus, in Alberti, as in Jones, we held that a violation of convicted prisoners' Eighth Amendment rights to protection from harm was enough to establish a violation of pretrial detainees' due process rights to protection from harm. Taken together, Alberti and Johnston hinted that a deliberate indifference standard might be an appropriate measure for all failure-to-protect claims, including those asserted by convicted inmates as well as pretrial detainees.

In Partridge v. Two Unknown Police Officers, 791 F.2d 1182 (5th Cir. 1986), we dealt with the standard of care owed to a

17

pretrial detainee who poses a suicide risk. In Partridge, a boy with mental problems hanged himself with a pair of socks while he was being detained in a city jail. We treated the alleged misconduct as a failure to provide needed medical care: "A serious medical need may exist for psychological or psychiatric treatment, just as it may exist for physical ills." Id. at 1187. We recognized that Estelle v. Gamble had established a test of deliberate indifference for determining whether a failure to provide medical care violates the Eighth Amendment rights of a convicted prisoner, but we hewed to the notion that a pretrial detainee's medical care rights were separately protected. In the end, however, Partridge suggested that there was a significant overlapping of the medical care rights of pretrial detainees and convicted prisoners: "Under the Bell v. Wolfish standard, the defendants had a duty, at a minimum, not to be deliberately indifferent to [the pretrial detainee's] serious medical needs." 791 F.2d at 1187. Further, whereas Johnston held that a negligent failure to protect cannot give rise to a due process claim, we confirmed in Partridge that the same was true for claims of inadequate medical care: "To the extent that the complaint in Partridge alleges negligence on the part of the arresting officer, it fails to state a claim . . . ." Id. at 1187 (footnote omitted). We held that only where "the claim rests on the detention center's deliberate and systematic lack of adequate care for detainees [does it] allege[] the kind of arbitrariness and abuse of power that is

18

preserved as a component of the due process clause in <u>Daniels</u>." <u>Id.</u>

After <u>Johnston</u>, <u>Alberti</u>, and <u>Partridge</u>, it was firmly settled in this circuit that a due process claim could never be based on a jail official's negligent failure to provide either medical care or protection from harm. Less pellucid, however, was the precise methodology and standard for evaluating such claims. <u>Stokes</u>, <u>Johnston</u>, and <u>Alberti</u> suggested that the standard for failure-to-protect claims should entail some measure of whether a jailer was "virtually," "callously," "consciously," or "deliberately" indifferent to the rights of the pretrial detainee. Likewise, <u>Partridge</u> expressly proffered a standard of deliberate indifference to serious medical needs.

A year later, in <u>Cupit v. Jones</u>, 835 F.2d 82 (5th Cir. 1987), we stepped away from the "deliberate indifference" formulation in a pretrial detainee's medical care case. In <u>Cupit</u> a detainee with a heart condition sued jail officers who allegedly denied him "the requisite diet, exercise, medication and stress-free atmosphere recommended by his doctors." <u>Id.</u> at 84. While recognizing that <u>Partridge</u> had explicitly pointed toward a standard of deliberate indifference to serious medical needs, our decision in <u>Cupit</u> drew on the measures of <u>Bell</u> and <u>Jones v. Diamond</u> in revitalizing the reasonable-relationship approach: "Today, we conclude that pretrial detainees are entitled to reasonable medical care unless the failure to supply that care is reasonably related to a legitimate governmental objective." 835 F.2d at 85.

19

Following <u>Alberti</u> and <u>Cupit</u>, our cases dealing with pretrial detainees fell loosely onto two tracks. On the failure-to-protect track, we relied on <u>Alberti</u> and <u>Johnston</u> in measuring pretrial detainees' failure-to-protect claims under a standard of deliberate indifference. <u>See, e.g.</u>, <u>Williams v. County of El Paso</u>, 966 F.2d 676 (table), No. 91-8505 (5th Cir. June 3, 1992) (per curiam) (unpublished); <u>Sodie v. Canulette</u>, 973 F.2d 923 (table), No. 91-3620 (5th Cir. Aug 13, 1992) (per curiam) (unpublished). On the medical care track, both <u>Williams</u> and <u>Sodie</u> relied on <u>Cupit</u> and asked whether failure to supply medical care to a pretrial detainee was reasonably related to a legitimate governmental objective. <u>See, e.g.</u>, <u>Williams</u>; <u>Sodie</u>. In addition, because we have allowed claims arising from suicides to be framed as a violation of the State's duty to provide reasonable medical care, our post-<u>Cupit</u> cases involving suicides by pretrial detainees have adhered to the reasonable-relationship test of <u>Cupit</u>, <u>Jones</u>, and <u>Bell</u>. <u>See, e.g.</u>, <u>Rhyne v. Henderson County</u>, 973 F.2d 386, 391-92 (5th Cir. 1992); <u>Burns v. City of Galveston</u>, 905 F.2d 100, 103 (5th Cir. 1990).

Two cases, however, crossed the otherwise separate tracks. In <u>Parker v. Carpenter</u>, 978 F.2d 190 (5th Cir. 1992), we applied the <u>Bell</u> test to a pretrial detainee's medical care claims <u>and</u> to his failure-to-protect claims. <u>Id.</u> at 192-93 (reversing dismissal of pro se suit by pretrial detainee who was attacked after being moved from low-risk minimum security section to overcrowded violent inmate section allegedly because of verbal altercation with jail officer). By contrast, in <u>Banana v. McNeel</u>, 5 F.3d 1495 (table),

20

No. 92-7184 (5th Cir. Sept. 22, 1993) (per curiam) (unpublished), we held that the deliberate indifference standard applied in both failure-to-protect <u>and</u> medical care cases. Hence, <u>Parker</u> and <u>Banana</u> cast doubt upon the notion of a clean dichotomy between claims alleging a failure to protect and those alleging a failure to provide reasonable medical care.

V.

As our cases suggest, we have traveled a peripatetic route in invoking different measures of the constitutional rights of pretrial detainees to medical care and protection from harm. Close analysis, however, discloses much consistency in our treatment of the underlying constitutional claims. Our goal in deciding this case today is to clarify our case law and to articulate the proper legal measures of a State's duty to tend to a pretrial detainee posing a risk of suicide. To that end, our analysis proceeds in four steps.

First, we reject the suggestion that the choice between the <u>Bell</u> test and a deliberate indifference standard turns on whether a pretrial detainee's claim is framed as a denial of medical care or a failure to protect; we conclude that both medical care and failure-to-protect cases should be treated the same for purposes of measuring constitutional liability. Second, we explain that the <u>Bell</u> test retains vitality only when a pretrial detainee attacks general conditions, practices, rules, or restrictions of pretrial confinement. When, by contrast, a pretrial detainee's claim is

21

based on a jail official's episodic acts or omissions, the Bell test is inapplicable, and hence the proper inquiry is whether the official had a culpable state of mind in acting or failing to act.

Third, we adopt a standard of deliberate indifference as the measure of culpability for such episodic acts or omissions. We emphasize that our use of a deliberate indifference standard does not scale back the constitutional rights of pretrial detainees. This is so because a proper application of Bell's reasonable-relationship test is functionally equivalent to a deliberate indifference inquiry. Finally, we turn to the question whether to apply an objective or subjective definition of deliberate indifference. Finding no constitutionally significant distinction between the rights of pretrial detainees and convicted inmates to basic human needs, including medical care and protection from violence or suicide, we conclude that a state jail official's constitutional liability to pretrial detainees for episodic acts or omissions should be measured by a standard of subjective deliberate indifference as enunciated by the Supreme Court in Farmer.

A.

As discussed above, our pretrial detainee cases have tended to evaluate medical care claims under Bell's reasonable-relationship test and failure-to-protect claims under a deliberate indifference standard. This dichotomy, however, does not offer a principled basis for invoking a different legal standard. Indeed, the Supreme Court applies the same standard in analyzing both types of claims

22

when asserted under the Eighth Amendment by convicted prisoners. Compare Farmer, 114 S. Ct. at 1977 (reviewing convicted prisoner's failure-to-protect claim under deliberate indifference standard) with Estelle v. Gamble, 429 U.S. at 104 (reviewing convicted prisoner's inadequate medical care claim under deliberate indifference test). As the Court has observed, the two classes of claims are similar from the perspectives of both prisoners and prison officials:

> [T]he medical care a prisoner receives is just as much a "condition" of his confinement as the food he is fed, the clothes he is issued, the temperature he is subjected to in his cell, and the protection he is afforded against other inmates. There is no indication that, as a general matter, the actions of prison officials with respect to these nonmedical conditions are taken under materially different constraints than their actions with respect to medical conditions.

Wilson, 111 S. Ct. at 2326-27.

Articulating the State's responsibility for preventing suicide by detainees exposes the absence of a constitutionally significant distinction between failure-to-protect and medical care claims. As we have explained, we have been willing to entertain suicide-based claims as implicating the State's responsibility to provide medical care. See Rhyne, 973 F.2d at 391-92; Burns, 905 F.2d at 103; Partridge, 791 F.2d at 1187. Quite often, however, the State's obligation to prevent suicide may implicate a kaleidoscope of related duties, including a duty to provide not only medical care, but also protection from self-inflicted harm. Thus, a state jail official might be liable for a suicide resulting from the official's failure to remove a pair of scissors from the cell of a

23

pretrial detainee known to be suicidal, even if the state official had otherwise provided the mentally disturbed detainee with constitutionally sufficient medical care.

Whether the State's obligation is cast in terms of a duty to provide medical care or protection from harm, its ultimate constitutional duty is to "to assume some responsibility for [the] safety and general well-being" of persons whose state-occasioned confinement renders them unable to fend for themselves. DeShaney, 489 U.S. at 200. The underlying purpose of requiring a state jail official to provide medical care to a pretrial detainee is to prevent the detainee from suffering further physical pain or harm. Imposing a constitutional duty upon jail officials to prevent physical abuse of a detainee, or to halt a beating that has already begun, serves the same underlying purpose. As DeShaney makes clear, the State's responsibility in both types of cases springs from the fact of incarceration and the resulting obligation to provide for the detainee's basic human needs. 489 U.S. at 200 (explaining that State's affirmative restraint of individual's liberty gives rise to duty to provide for his "basic human needs," including "medical care" and "reasonable safety"). Given such similarities, the same legal measure should govern the due process rights of a pretrial detainee to medical care and to protection from harm or violence.

In short, the choice between the Bell test and a deliberate indifference standard must turn on something other than whether a pretrial detainee's claim is framed as denial of medical care or a

24

failure to protect. As we now explain, this choice between the two standards is to be made by distinguishing between constitutional challenges to conditions, practices, rules, or restrictions on the one hand, and episodic acts or omissions on the other.

## B.

Constitutional attacks on general conditions, practices, rules, or restrictions of pretrial confinement are referred to as "jail condition cases." The <u>Bell</u> test works comfortably in such cases because the jail officials' state of mind is not a disputed issue. In true jail condition cases, an avowed or presumed intent by the State or its jail officials exists in the form of the challenged condition, practice, rule, or restriction. A State's imposition of a rule or restriction during pretrial confinement manifests an avowed intent to subject a pretrial detainee to that rule or restriction. Likewise, even where a State may not want to subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices. Thus, a true jail condition case starts with the assumption that the State intended to cause the pretrial detainee's alleged constitutional deprivation. Only with such intentionality as a given is the <u>Bell</u> test useful. <u>See, e.g.</u>, <u>Ortega v. Rowe</u>, 796 F.2d 765, 768 (5th Cir. 1986) ("Only if the evidence suggests that the appellees knew of the jails' conditions, or intended to force

25

the detainees to endure such conditions, would a <u>Bell</u> analysis retain vitality.").

When, by contrast, a pretrial detainee's claim of failure to provide medical care or protection from violence does not challenge a condition, practice, rule, or restriction, but rather attacks the episodic acts or omissions of a state jail official, the question is whether that official breached his constitutional duty to tend to the basic human needs of persons in his charge. With episodic acts or omissions, intentionality is no longer a given, and <u>Bell</u> offers an ill-fitting test.[2] Asking about the rationality of the relationship between an official's episodic acts or omissions and a legitimate governmental objective begs the underlying question whether that official had the requisite mental state to establish his liability as a perpetrator of the particular act or omission, not as a dispenser of intended conditions or restrictions.

When a pretrial detainee's constitutional claim is based on particular acts or omissions by one or more jail officials, the difficult question is whether the challenged act or omission can be characterized as episodic. For the <u>Bell</u> test to apply, a jailer's act or omission must implement a rule or restriction or otherwise demonstrate the existence of an identifiable intended condition or

---

[2]<u>Wilson v. Seiter</u> refused to distinguish "between `short-term' or `one-time' conditions (in which a state of mind requirement would apply) and `continuing' or `systemic' conditions (where official state of mind would be irrelevant)." 111 S. Ct. at 2325; <u>see also</u> <u>id.</u> at 2325 n.1. Our explanation today does not step upon this principle. We are consistent with <u>Wilson</u>'s holding that state of mind is significant in <u>both</u> situations, albeit differently demonstrated in each.

practice. If a pretrial detainee is unable to point to such an established rule or restriction, then he must show that the jail official's acts or omissions were sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by other officials, to prove an intended condition or practice to which the Bell test can be meaningfully applied. Otherwise, in the absence of such a condition, practice, rule, or restriction, a jail official's act or omission can give rise to constitutional liability only if he was culpable, under an appropriate legal standard, with respect to the harm to the detainee. We now articulate that standard.

### C.

Our inquiry begins with the fundamental rule that negligent inaction by a jail officer does not violate the due process rights of a person lawfully held in custody of the State. See Davidson, 474 U.S. at 348 ("[T]he protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials."); Johnston, 786 F.2d at 1259 (rejecting liability for negligent failure-to-protect); Partridge, 791 F.2d at 1187 (rejecting liability for negligent failure to provide medical care); see also Daniels v. Williams, 474 U.S. 327, 332 (1986). Relying on Daniels and Davidson, the Seventh Circuit has held that gross negligence will not suffice either:

> [T]he distinction between negligence and gross negligence does not respond to the due process clause's function, which is to control abuses of government power. A "gross" error is still only an error, and an error is not

27

an abuse of power.  Since an error by a government official is not unconstitutional, "it follows that `gross negligence' is not a sufficient basis for liability."

Salazar v. City of Chicago, 940 F.2d 233, 238 (7th Cir. 1991) (quoting Archie v. City of Racine, 847 F.2d 1211, 1220 (7th Cir. 1988) (en banc)).  These cases demonstrate that the constitutional standard of conduct must step up from negligence — that it must be more than mere or even gross negligence.

Formulating a gossamer standard higher than gross negligence but lower than deliberate indifference is unwise because it would demand distinctions so fine as to be meaningless.  It would also risk endorsing an objective standard that is contrary to the Supreme Court's holding that the Due Process Clause was meant to prevent "abusive government conduct."  Davidson, 474 U.S. at 348; see also Salazar, 940 F.2d at 238 (adopting criminally reckless standard in part because "an error is not an abuse of power").

All of our cases have applied either the Bell test or a standard akin to deliberate indifference.  Since we are foreclosing the application of the Bell test to claims against an individual jailer for episodic acts or omissions, we need pause only if there is a reason not to adopt a standard of deliberate indifference.

We find no such reason.  Application of a deliberate indifference standard to claims by pretrial detainees is consistent with our cases and the dictates of Bell, because the deliberate indifference standard does not impose a higher burden on pretrial detainees than the Bell test.  Properly understood, the Bell test is functionally equivalent to a deliberate indifference inquiry.

28

The "reasonably related to a valid penological standard" never purported to allow recovery for mere negligence. To the contrary, this test is deferential to jail rulemaking; it is in essence a rational basis test of the validity of jail rules. That is, asking whether a rule is reasonably related to a legitimate governmental objective is much like asking whether a legislative enactment has any rational basis, except in the context of jail administration the legislative purpose is a given — typically a penological or administrative purpose. Violation of the <u>Bell</u> test requires acts or omissions not too distant from a standard of arbitrary and capricious conduct.

We are mindful that we have sometimes perceived the standard of reasonably related to a legitimate governmental objective to be less than or equal to deliberate indifference. <u>See, e.g.</u>, <u>Evans v. City of Marlin</u>, 986 F.2d 104, 107 (5th Cir. 1993); <u>Burns</u>, 905 F.2d at 103; <u>Lewis v. Parish of Terrebone</u>, 894 F.2d 142, 145 (5th Cir. 1990). Far from demonstrating that the <u>Bell</u> test is designed to be more favorable to pretrial detainees, however, these decisions confirm that the <u>Cupit</u>-<u>Jones</u>-<u>Bell</u> test — reasonable medical care unless the failure to supply that care is reasonably related to a legitimate governmental objective — is easily confused with a negligence standard. <u>See, e.g.</u>, <u>Walton v. Alexander</u>, 44 F.3d 1297, 1300 n.3 (5th Cir. 1995) (en banc) (clipping final fifteen words from <u>Cupit</u> standard to suggest that test demands only "reasonable medical care"). We may have added to the uncertainty by dismissing claims for failure to show negligence without always making it

29

clear that negligence is a necessary but not sufficient finding under Cupit. See, e.g., Cupit, 835 F.2d at 85 (denying recovery where plaintiff was unable to show denial of reasonable medical care). There should be no misunderstanding: Negligent conduct by a prison official cannot be the basis for a due process claim.

The only Supreme Court case that arguably counsels against a deliberate indifference standard is Youngberg v. Romeo, 457 U.S. 307 (1982). In Youngberg, the plaintiff was the mother of a mental patient who suffered injuries while involuntarily committed to a state mental institution. The district court instructed the jury that it could find the defendants liable only if the defendants showed deliberate indifference to Romeo's serious medical needs. Id. at 312. The Supreme Court held that the district court erred in using the Eighth Amendment's deliberate indifference standard. Id. at 312 n.11. The Court found the appropriate standard in the Due Process Clause of the Fourteenth Amendment, concluding that "liability may be imposed only when the decision by the [mental health] professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person actually did not base the decision on such a judgment." Id. at 323.

The Court in Youngberg thus announced a distinct standard to be applied in measuring the State's constitutional duties to mental incompetents, one that differed from both the Bell test and the deliberate indifference standard. The Youngberg measure flowed from the premise that "[p]ersons who have been involuntarily

30

committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." Id. at 321-22. The Court's later decision in DeShaney, however, called into question the constitutional significance of this premise. DeShaney clarified that "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." 489 U.S. at 200. In other words, DeShaney suggests that a State's declared intent to confine incompetents for their own benefit, as opposed to its announced purpose to punish convicted criminals, should have no bearing on the nature of the constitutional duty owed to either group. What matters under DeShaney is that "the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself." Id. Since the State restrains the individual liberty of both mental incompetents and convicted inmates in a like manner, the State should incur the same duties to provide for the basic human needs of both groups.

The Court in DeShaney did not address whether involuntarily confined mental incompetents and convicted inmates shared the same constitutional rights to medical care and safety. Since DeShaney suggested that both groups enjoyed the same rights, however, either the Youngberg standard or the deliberate indifference standard must give way to achieve the requisite equivalence in constitutional rights. The Court thus has cast doubt on the vitality of Youngberg

31

by confirming that a deliberate indifference standard is the appropriate measure of constitutional liability for a prison official's failure to provide a convicted inmate with basic human needs. See, e.g., Wilson, 111 S. Ct. at 2326-27 (applying deliberate indifference standard to convicted prisoners' challenge to conditions of confinement); Farmer, 114 S. Ct. at 1977 (clarifying that subjective deliberate indifference standard governs convicted prisoners' failure-to-protect claims).

We decline to resolve this tension at this time. Youngberg, Wilson, and Farmer did not deal with pretrial detainees, so their respective standards are not dispositive of this suit by Mr. Hare. It is not for us to announce that the Supreme Court has overruled Youngberg. Youngberg does not foreclose our adoption of a deliberate indifference standard as the measure of a jail official's liability for episodic acts or omissions that result in a denial of pretrial detainees' basic human needs. As we have explained, no constitutionally relevant difference exists between the rights of pretrial detainees and convicted prisoners to be secure in their basic human needs. Since the Supreme Court has consistently adhered to a deliberate indifference standard in measuring convicted prisoners' Eighth Amendment rights to medical care and protection from harm, we adopt a deliberate indifference standard in measuring the corresponding set of due process rights of pretrial detainees.

In sum, we conclude that a deliberate indifference standard is compelled by our cases and consistent with the relevant teachings

of the Supreme Court.[3]  We hold that the episodic act or omission of a state jail official does not violate a pretrial detainee's constitutional right to be secure in his basic human needs, such as medical care and safety, unless the detainee demonstrates that the official acted or failed to act with deliberate indifference to the detainee's needs.

                              D.

We turn now to the formulation of the deliberate indifference standard.  On June 6, 1994, four days before the panel entered its first opinion in this case, the Supreme Court decided Farmer v. Brennan, 114 S. Ct. 1970 (1994).  Farmer was significant in articulating a subjective definition of deliberate indifference in the context of a convicted inmate's Eighth Amendment challenge to the conditions of his imprisonment.  The Court began by noting that prison officials have a duty under the Eighth Amendment to "ensure that inmates receive adequate food, clothing, shelter and medical

---

[3]Most circuits have endorsed a deliberate indifference inquiry as the measure of state officials' constitutional duty to safeguard the basic human needs of pretrial detainees, including protection from suicide.  See, e.g., Elliot v. Cheshire County, 940 F.2d 7, 10 & n.2 (1st Cir. 1991) (suicide as medical care claim); Kost v. Kozakiewicz, 1 F.3d 176, 188 (3d Cir. 1993) (medical care); Hill v. Nicodemus, 979 F.2d 987, 991 (4th Cir. 1992) (suicide as medical care claim); Heflin v. Stewart County, 958 F.2d 709, 715-16 (6th Cir. 1992); Hall v. Ryan, 957 F.2d 402, 405 (7th Cir. 1992) (suicide as medical care claim); Bell v. Stigers, 937 F.2d 1340, 1343 (8th Cir. 1991) (failure to prevent suicide); Redman v. County of San Diego, 942 F.2d 1435, 1443 (9th Cir. 1991) (en banc), cert. denied, 502 U.S. 1074 (1992) (failure to protect from prison rape); Howard v. Dickerson, 34 F.3d 978, 980 (10th Cir. 1994) (medical care); Tittle v. Jefferson County Commission, 10 F.3d 1535, 1539-40 (11th Cir. 1994) (en banc) (failure to prevent suicide).

care, and [to] `take reasonable measures to guarantee the safety of the inmates.'"  Id. at 1976 (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)).  "Having incarcerated `persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct,' having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course."  Id. at 1977 (quoting Hudson v. Palmer, 468 U.S. at 526, and citing DeShaney, 489 U.S. at 199-200).

The Court emphasized, however, that an inmate must satisfy two requirements to prevail on a claim that a prison official violated his Eighth Amendment right to humane prison conditions.  First, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm."  Id. at 1977.  Second, the inmate must show that the prison official had a culpable state of mind — that the official was deliberately indifferent to inmate health or safety.  Id.  While these two elements were features of Eighth Amendment jurisprudence, the critical question in Farmer was whether to apply a subjective or objective definition of deliberate indifference.

The Court explained that it was "fair to say that acting or failing to act with deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk."  Id. at 1978.  In equating deliberate indifference with recklessness, however, the Court noted that the "term recklessness is not self-defining."  Id.  While recklessness

34

exists in the civil law if a person fails to act in the face of an unjustifiably high risk that is known or should be known, the criminal law permits a finding of recklessness only when a person disregards a risk of harm of which he is aware. In other words, the civil law espouses an objective definition of recklessness while the criminal law proffers a subjective one. Id. at 1979.

Faced with a choice between these two approaches, the Court was persuaded that the subjective definition "comports best with the text of the [Eighth] Amendment as [its] cases [had] interpreted it." Id. It emphasized that "[t]he Eighth Amendment does not outlaw cruel and unusual `conditions'; it outlaws cruel and unusual `punishments.'" Id. The Court explained that "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." Id. Accordingly, the Court held "that a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." Id. at 1984.

Though Farmer dealt specifically with a prison official's duty under the Eighth Amendment to provide a convicted inmate with humane conditions of confinement, we conclude that its subjective definition of deliberate indifference provides the appropriate standard for measuring the duty owed to pretrial detainees under the Due Process Clause. See, e.g., Sanderfer v. Nichols, 62 F.3d

35

151, 154-55 (6th Cir. 1995) (applying <u>Farmer</u>'s subjective standard of deliberate indifference to pretrial detainee's medical care claim); <u>Murphy v. Walker</u>, 51 F.3d 714, 717 (7th Cir. 1995) (citing <u>Farmer</u> in applying deliberate indifference test to medical care claim).[4]  First, despite the distinct constitutional sources of the rights of pretrial detainees and convicted inmates, state jail and prison officials owe the same duty to provide the same quantum of basic human needs and humane conditions of confinement to both groups.  We are mindful that a pretrial detainee's rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner."  <u>City of Revere</u>, 463 U.S. at 244; <u>cf.</u> <u>Cupit</u>, 835 F.2d at 84 ("[T]he due process clause of the fourteenth amendment accords pretrial detainees rights not enjoyed by convicted inmates under the eighth amendment prohibition against cruel and unusual punishment.)."  That pretrial detainees may have more protections or rights in general, however, does not mean that they are entitled to greater protection of rights shared in common

---

[4]We separate the two issues:  the existence of a constitutional violation simpliciter and a municipality's liability for that violation.  Different versions of the deliberate indifference test govern the two inquiries.  Our opinion in this case makes clear that to prove an underlying constitutional violation in an individual or episodic acts case, a pre-trial detainee must establish that an official acted with <u>subjective</u> deliberate indifference.  Once the detainee has met this burden, she has proved a violation of her rights under the Due Process Clause.  To succeed in holding a municipality accountable for that due process violation, however, the detainee must show that the municipal employee's act resulted from a municipal policy or custom adopted or maintained with <u>objective</u> deliberate indifference to the detainee's constitutional rights.  <u>See</u> <u>Farmer</u>, 114 S.Ct. at 1981 ("It would be hard to describe the <u>Canton</u> understanding of deliberate indifference, permitting liability to be premised on obviousness or constructive notice, as anything but objective.").

36

with convicted inmates.  See Cupit, 835 F.2d at 85 (noting that "the distinction as to medical care due a pretrial detainee, as opposed to a convicted inmate, may indeed be a distinction without a difference").  For purposes of measuring constitutional duties, our case law and the teachings of the Supreme Court indicate that there is no legally significant situation in which a failure to provide an incarcerated individual with medical care or protection from violence is punishment yet is not cruel and unusual.  The fact of conviction ought not make one more amenable under the Constitution to unnecessary random violence or suffering, or to a greater denial of basic human needs.

Second, we find that the Farmer formulation of the deliberate indifference standard properly captures the essence of the inquiry as to whether a pretrial detainee has been deprived of his due process rights to medical care and protection from violence.  The Farmer standard of subjective "deliberate indifference serves under the Eighth Amendment to ensure that only inflictions of punishment carry liability."  114 S. Ct. at 1981; see also id. at 1979 ("[A]n official's failure to alleviate a significant risk that he should have perceived but did not . . . cannot under our cases be condemned as the infliction of punishment.").  Thus, the Farmer test purports to distinguish between errant inaction and infliction of punishment:  Punishment is inflicted only when a prison official was aware of a substantial risk of serious harm to a convicted inmate but was deliberately indifferent to that risk.

The response demanded of jail officials with actual knowledge of such risk of serious injury is that he not act with deliberate indifference. We share the concern of the Seventh Circuit that the Farmer standard not be transmuted into a negligence inquiry. "Deliberate indifference, *i.e.*, the subjective intent to cause harm, cannot be inferred from a prison guard's failure to act reasonably. If it could, the standard applied would be more akin to negligence than deliberate indifference." Id.[5]

We reject the suggestion that the proper measure of the duty to respond of persons with the requisite knowledge ought to revisit negligence. Under that view negligence tossed out the front door re-enters through the back. The duty to respond and the measure of the adequacy of the response are dependant each upon the other for their level of stringency. The view that the duty to respond announced in Farmer is a negligence standard misses the fact that the Farmer test is a marriage of elements, not a listing of two elements independent of each other in application. We reject that view.

Keeping in mind that the Due Process Clause forbids the "punishment" of pretrial detainees, Farmer's significance for claims of inadequate medical care or protection from harm is

---

[5]We construe Farmer's "respond reasonably" and "reasonable measures" language, id. at 1982-83, 1984, to relate necessarily to whether the first, or objective, component of an Eighth Amendment violation has been made out. That leaves the second, subjective prong (state of mind more blameworthy than lack of due care); where there is recognition of substantial danger and a response thereto, this second prong can be satisfied only in respect to the response itself.

apparent. The Due Process Clause proscribes any punishment of pretrial detainees, cruel and unusual or otherwise. The Farmer standard of deliberate indifference purports to ask only whether an official "punished" an inmate, not whether the punishment was cruel and unusual. In essence, what Farmer says is that a state official who has subjective knowledge of the risk of serious injury to a convicted prisoner or a pretrial detainee and whose response is deliberately indifferent inflicts either cruel and unusual punishment or no punishment at all.

We are urged to downshift the Farmer standard from the requirement that the official be subjectively aware of this risk of serious injury to an objective measure of "should have been aware." As we have explained, however, this objective standard offered for liability under the due process clause is redolent with negligence and its measures. That will not do. There is no middle ground, no realm in which a prison or jail officer's disregard of a risk of a serious harm is punishment but not cruel and unusual.

## VI.

In sum, we hold (1) that the State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial detainees and convicted inmates with basic human needs, including medical care and protection from harm, during their confinement; and (2) that a state jail official's liability for episodic acts or omissions cannot attach unless the official had subjective knowledge of a substantial risk of serious harm to a

39

pretrial detainee but responded with deliberate indifference to that risk.

Richard Hare alleges that the defendants violated the Due Process Clause of the Fourteenth Amendment by causing Tina Hare to be deprived of her right to reasonable care.  The district court found that there was a genuine issue of material fact as to whether the defendants knew or should have known of Ms. Hare's suicide risk.  As we have explained, however, the correct legal standard is not whether the jail officers "knew or should have known," but whether they had gained actual knowledge of the substantial risk of suicide and responded with deliberate indifference.  This appeal comes from a denial of summary judgment rejecting qualified immunity.  We remand for application of the standard announced today.  See Rankin v. Klevenhagen, 5 F.3d 103, 105 (5th Cir. 1993). We express no opinion regarding the outcome of such further proceedings in the trial court.

VACATED and REMANDED.

JAMES L. DENNIS, Circuit Judge, Specially Concurring:

The majority holds that a plaintiff, who brings a 42 U.S.C. § 1983 action arising out of the suicide of a pretrial detainee resulting from the violation of her rights to physical protection and medical services under the Due Process Clause of the Fourteenth Amendment, must show that the responsible officials had subjective knowledge of a substantial risk of serious harm to the pretrial detainee but responded to that risk with "deliberate indifference," as defined by the Eight Amendment case of Farmer v. Brennan, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). I concur only in the judgment vacating the district court decision and remanding the case for further proceedings because (1) application of the "deliberate indifference" test (for determining cruel and unusual punishment of convicts) to pretrial detainees' claims is inconsistent with prior Supreme Court decisions that detainees are guiltless individuals protected by a broader Due Process Clause right to be free from any punishment whatsoever; and (2) even if pretrial detainees are to be shielded only from cruel and unusual punishment as measured by the "deliberate indifference" standard, the majority opinion's failure to consistently articulate fully the Farmer v. Brennan definition of that standard runs the risk of affording pretrial detainees less protection from inhumane treatment than convicted criminals.

1.

In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, the proper inquiry is whether those conditions amount to punishment of the detainee. For under the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law. Bell v. Wolfish, 441 U.S. 520, 535 (1979). A person lawfully committed to pretrial detention has not been adjudged guilty of any crime. He has had only a judicial determination of probable cause as a prerequisite to the extended restraint of his liberty following arrest. Id at 536.

41

Under such circumstances, the Government concededly may detain him to ensure his presence at trial and may subject him to the restrictions and conditions of the detention facility so long as those conditions and restrictions do not amount to punishment, or otherwise violate the Constitution. Id at 536-537.

Due process requires that a pretrial detainee not be punished. A sentenced inmate, on the other hand, may be punished, although that punishment may not be "cruel and unusual" under the Eighth Amendment. Id. at 535, n. 16. The Court recognized this distinction in Ingraham v. Wright, 430 U.S. 651, 671-672 (1977): "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions. See United States v. Lovett, 328 U.S. 303, 317-318 (1946). ...[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law. Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment." Id at 671 n. 40. In other words, "the Fifth Amendment includes freedom from punishment within the liberty of which no person may be deprived without due process of law." Bell v. Wolfish, 441 U.S. at 535, n.17 (1979).

In determining whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of that word, a court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose. Id. at 538. Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]." Id., quoting Kennedy v. Mendoza-Martinez, 372 U.S. at 168-169. Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment." Conversely, if a restriction or condition is not reasonably related to a

legitimate goal--if it is arbitrary or purposeless--a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees. Bell v. Wolfish, 441 U.S. at 539.

I respectfully disagree with the majority's conclusion that "the Bell test retains vitality only when a pretrial detainee attacks general conditions, practices, rules, or restrictions of pretrial confinement" and is completely inapplicable when "a pretrial detainee's claim is based on a jail official's episodic acts or omissions..." Hare v. City of Corinth, No. 93-7192, slip op. at 21-22. The Bell Court did not place any such limitation on its holding that, under the Due Process Clause, a pretrial detainee may not be punished prior to an adjudication of guilt in accordance with due process of law.

Instead, the Court specified that the factors identified in Kennedy v. Mendoza-Martinez, 372 U.S. 144 (1963) provide useful guideposts in determining whether particular restrictions and conditions accompanying pretrial detention amount to punishment in the constitutional sense of the word. While it is all but impossible to compress the distinction into a sentence or a paragraph, the Mendoza-Martinez Court described the tests traditionally applied to determine whether a governmental act is punitive in nature:

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment--retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned are all relevant to the inquiry, and may often point in differing directions. Id at 168-169 (footnotes omitted).

Accordingly, in Bell v. Wolfish, the Court concluded that if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more--such as a showing of an expressed intent to punish--amount to "punishment." Conversely, the Court stated, if a restriction or condition is not reasonably related to a legitimate goal--if it is arbitrary or purposeless--a court may permissibly infer that the purpose of the governmental action is punishment that may not be inflicted upon detainees. Id at 539. Moreover,

43

as an illustration of an arbitrary or excessive restriction or condition, the Court gave the following example of an official's act or omission against an individual detainee:

> "[L]oading a detainee with chains and shackles and throwing him in a dungeon may ensure his presence at trial  and preserve the security of the institution. But it would be difficult to conceive of a situation where conditions so harsh, employed to achieve objectives that could be accomplished in so may (sic) alternative and less harsh methods, would not support a conclusion that the purpose for which they were imposed was to punish." Id at n. 20.  (Emphasis added).

The Supreme Court has not rendered any decision since Bell v. Wolfish that detracts from its vitality when applied to a pretrial detainee's deprivation of the due process right to liberty from punishment caused by the episodic act or omission of an individual jail official.  In fact, in Wilson v. Seiter, 501 U.S. 294 (1991) the Court expressly refused to recognize a distinction between cases involving "conditions of confinement" and others arising from "specific acts or omissions directed at individual prisoners" in its Eighth Amendment cruel and unusual punishment analysis. Id at n. 1.  The Court reasoned:

> It seems to us...that if an individual prisoner is deprived of needed medical treatment, that is a condition of *his* confinement, whether or not the deprivation is inflicted upon everyone else.  Undoubtedly deprivations inflicted upon all prisoners are, as a policy matter, of greater concern than deprivations inflicted upon particular prisoners,  but we see no basis whatever for saying that the one is a "condition of confinement" and the other is not--much less that the one constitutes "punishment" and the other does not. ...Id at n. 1.

The majority's attempt to resurrect the same invalid distinction in order to isolate pretrial detainees' claims based upon "specific acts or omissions directed at individual prisoners" and place them under the aegis of the Eighth Amendment "deliberate indifference" standard rather than under the broader protection of the Due Process Clause is clearly inconsistent with the Supreme Court's cases.   The Supreme Court's decisions repeatedly indicate that convicted inmates have less protections and rights than pretrial detainees and other unconvicted persons in the state's custody. Certainly, the ambit of the state's duty to protect pretrial detainees from any punishment is greater than that of its  duty to protect convicted inmates only from cruel or unusual  punishment.  Bell v. Wolfish, supra.  "Persons who have been involuntarily committed are entitled to more considerate

44

treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." Youngberg v. Romeo, 457 U.S. 307, 321-322 (1982). See also, Riggins v. Nevada, 504 U.S. 127 (1992); City of Revere v. Massachusetts General Hospital, 463 U.S. 239 (1983); Graham v. Connor, 490 U.S. 386 (1989). Contrary to the majority's suggestion, the Supreme Court's decision in DeShaney v. Winnebago County DSS, 489 U.S. 189 (1989) does not undermine any of these authorities. In DeShaney the Court merely distinguished Youngberg v. Romeo, supra, holding that the state had no duty, under the Due Process Clause, to protect a child against abuse by his father, even though the state knew that the child faced danger of such abuse, where (1) the child was not in the state's custody, and (2) the state played no part in creation of the danger, nor did the state do anything to render the child any more vulnerable to such danger.

Therefore, the majority departs radically from the Supreme Court's pretrial detainee precedents by refusing to apply the Mendoza-Martinez factors, even as abbreviated and refined by Bell v. Wolfish. Even if the majority deems these factors to be too cumbersome for felicitous application in detainee failure to protect or to medically treat cases, there is no reason to relegate innocent detainees and other wards of the state to protection only against cruel or unusual punishment as measured by the criminal recklessness or "deliberate indifference" standard defined by Farmer v Brennan for cruel and unusual punishment cases. If a short hand version of the Mendoza-Martinez and Bell tests must be devised for failure to protect or medically treat cases, I do not understand why the civil recklessness standard, see Farmer v. Brennan, 114 S.Ct. 1970, 1978-79, and authorities cited, or even a gross negligence standard would not be appropriate, so long as all relevant legitimate governmental objectives are also taken into consideration. Either test would accord to unconvicted detainees the greater respect for their rights due them as innocent persons while insulating jail officials from liability for their ordinary negligent or inadvertent acts or omissions. Application of the criminal recklessness or deliberate indifference test to pretrial detainees' claims will permit the state to punish detainees in violation of Supreme Court decisions, so long as the punishment is not cruel or unusual.

2.

According to the majority's holding, the claims of individual pretrial detainees based on a jail official's failure to protect them from harm or to provide them with medical services shall be governed by the same Eighth Amendment cruel or unusual punishment-deliberate indifference rubric defined by Farmer v. Brennan, 114 S.Ct. 1970 (1994) for the adjudication of similar claims by convicted inmates. I write further only out of concern that the majority opinion may not explicate the Farmer v. Brennan decision sufficiently to alert the trial bench and bar of its requirements that have now been made applicable to pretrial detainee cases in this circuit.

Farmer v. Brennan held that a prison official may be held liable for denying to a convicted prisoner humane conditions of confinement, under the rule that the official's deliberate indifference to substantial risk of serious harm to the prisoner violates the cruel and unusual punishments clause of the Eight Amendment, if the official (1) is subjectively aware that the prisoner faces such risk, Id at 1975; and (2) disregards that risk by failing to take reasonable measures to abate the risk. Id at 1976. Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious. Id t 1981. For example, if an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus must have known about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant official had actual knowledge of the risk. Id at 1981-82. However, it remains open to the officials to prove that they were unaware even of an obvious risk to inmate health or safety. That a trier of fact may infer knowledge from the obvious, in other words, does not mean that it must do so. Id at 1982. In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. Id at 1982-83. As Justice Blackmun observed in his concurring opinion, "Under

46

the Court's decision today, prison officials may be held liable for failure to remedy a risk so obvious and substantial that the officials must have known about it...." Id at 1986.