786 F.2d 1254
 Chester Jordan JOHNSTON, Jr., Plaintiff-Appellee,
v.
Eddie LUCAS, Aaron Jagers, Major Fred Childs, Barry McGrew,
Robert Grayson, James Flowers, J.B. Williams, and
Joe Conners, Defendants-Appellants.
 No. 85-4210.
 United States Court of Appeals,
Fifth Circuit.
 April 11, 1986.
 
 Robert L. Gibbs, Leonard C. Vincent, Asst. Atty. Gen., Edwin L. Pittman, Atty. Gen., Jackson, Miss., for defendants-appellants.
 Jim Waide, West Point, Miss., Jacqueline C. Estes, Tupelo, Miss., for plaintiff-appellee.
 Appeal from the United States District Court for the Northern District of Mississippi.
 Before REAVLEY, WILLIAMS and HIGGINBOTHAM, Circuit Judges.
 REAVLEY, Circuit Judge:
 
 
 1
 Eddie Lucas, Aaron Jagers, Fred Childs, Robert Grayson and Barry McGrew appeal the judgment finding them liable for damages, under 42 U.S.C. Sec. 1983, to Chester J. Johnston, an inmate at Mississippi's Parchman State Penitentiary. Johnston sued for injuries he sustained in a beating on January 26, 1980 and a stabbing on December 28, 1981. Both incidents stemmed from animosity between Johnston and fellow inmate George Schwindling; they are otherwise discrete. The district court, in accordance with the recommendations of the magistrate following a three-and-one-half-day bench trial, awarded Johnston $5,000 from McGrew and Grayson for the 1980 incident, and $2,000 from Lucas, Jagers, and Childs for the 1981 incident, plus interest and attorneys fees. We reverse the recovery from Lucas, Jagers, and Childs, and otherwise affirm.
 
 I.
 THE 1980 INCIDENT
 
 2
 The parties agree that while Schwindling and Johnston were housed in neighboring cells, Schwindling informed a guard, James Flowers, that he intended to knife Johnston. He later repeated the threat to Unit Administrator Childs. When a search of Schwindling's cell turned up a handmade knife, Childs ordered Flowers to move Johnston immediately for his protection. It was early morning, and all of the prisoners in the building were still locked into their cells.
 
 
 3
 At this point, the accounts diverge. Johnston testified that Flowers summarily ordered him to exchange cells with inmate Shelton Myers. Because the new cell, # 51, was not properly equipped, Johnston asked to speak to the Unit Administrator. Still without explaining the reason for the move, Flowers left and returned with four backup guards, including McGrew and Grayson. Flowers, McGrew and Grayson entered Johnston's cell, # 41, and handcuffed his hands behind his back. Then McGrew, having slipped another set of handcuffs over his left hand like brass knuckles, struck Johnston on his temple, knocking him "semi-conscious." Johnston doubled over onto the bed whereupon Grayson hit him on the back. Johnston fell to the floor and was dimly aware of being kicked repeatedly. Inmate Myers, having packed his belongings for the exchange, was outside Johnston's cell at the time.
 
 
 4
 Johnston was taken to the hospital where records show he was admitted for an injury to his groin, as well as various abrasions on his head, back, arm and wrists. He was released from the hospital some two weeks later. Medical records of McGrew and Grayson indicate that the knuckles on McGrew's left hand were scraped and Grayson had received a severe bruise on his leg.
 
 
 5
 The weekly listings of cell assignments showed Myers in # 51 and Johnston in # 41 the week before the incident; the following week, their assignments were reversed. Myers confirmed that he had witnessed part of the attack. Before Flowers blocked his view, Myers testified, he saw Grayson and McGrew hit Johnston and Johnston fall. Schwindling testified that he heard Johnston being beaten and saw him carried away afterwards. Another inmate, Mickey Smith, corroborated Johnston's account in a taped deposition.
 
 
 6
 Defendants Grayson and McGrew denied that Myers had participated in or seen the move; the new cell was empty and properly equipped at the time. They further testified that Johnston became violent when ordered to move even though Flowers explained about Schwindling's threat. The guards were forced to wrestle Johnston to the bed in order to handcuff him and then to carry him, kicking and screaming, to cell # 51. After being thrust into the cell, Johnston straddled a bed rail and began jumping up and down on it. Fearing he would injure himself seriously, the guards entered the cell and removed the handcuffs whereupon Johnston ripped the fluorescent light bulb out of the socket and smashed it against the door. He was taken to the hospital as a precaution, but was not visibly hurt or in pain. McGrew later wrote up a two-page report detailing the incident, without referring to Johnston's conduct on the bed.
 
 
 7
 Relying primarily on the documentary evidence and on Myers' corroboration of Johnston's testimony, the magistrate concluded that McGrew and Grayson had used unnecessary force to move Johnston to cell # 51, thereby causing Johnston's injuries. He found the testimony of the defendant guards incredible and recommended joint and several liability for the damages. The district court adopted these recommendations after a four-month review of the record.[1]
 
 
 8
 Following the court's announcement of its decision, defendants moved for a new trial because Myers recanted his testimony. The motion was denied.
 
 Discussion
 
 9
 Defendants McGrew and Grayson primarily dispute the lower court's findings of fact. As an appellate court, we can reverse factual findings, especially credibility findings, only if they are "clearly erroneous." Fed.R.Civ.P. 52; Anderson v. City of Bessemer City, --- U.S. ----, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518, 528 (1985). "A court of appeals has neither permission nor prerogative to reappraise the credibility of witnesses." Olgin v. Darnell, 664 F.2d 107, 108 (5th Cir.1981) (citations omitted).
 
 
 10
 Both the magistrate and the district court chose to believe, in substantial portion, Johnston's version of the facts. These findings are not clearly erroneous; on the contrary, there is substantial evidence in the record to support them. Johnston's testimony is consistent with both the medical records and the cell assignment lists, as well as with the corroborating testimony of Myers, Schwindling and Smith. Defendants' explanations, particularly when viewed as a whole, are somewhat strained.
 
 
 11
 Moreover, the court correctly applied those facts to the appropriate legal standard. The focus of Sec. 1983 is on the "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." Monroe v. Pape, 365 U.S. 167, 184, 81 S.Ct. 473, 482, 5 L.Ed.2d 492, 503 (1961) (quoting United States v. Classic, 313 U.S. 299, 325-26, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941)). See also Daniels v. Williams, --- U.S. ----, 106 S.Ct. 662, 665-66, 88 L.Ed.2d 662 (1986); Coon v. Ledbetter, 780 F.2d 1158, 1163 (5th Cir.1986); Rankin v. City of Wichita Falls, 762 F.2d 444, 447 (5th Cir.1985). Prison officials can incur liability under Sec. 1983 when their abuse of power inflicts cruel and unusual punishment on prisoners. To determine whether physical abuse by prison guards constitutes an abuse of power, the court must consider three factors: the amount of force exerted relative to the need for its application; the extent of the injury inflicted; and the motivation of the officers. Williams v. Kelley, 624 F.2d 695, 697 (5th Cir.1980), cert. denied, 451 U.S. 1019, 101 S.Ct. 3009, 69 L.Ed.2d 391 (1981); see also McFadden v. Lucas, 713 F.2d 143, 146 (5th Cir.), cert. denied, 464 U.S. 998, 104 S.Ct. 499, 78 L.Ed.2d 691 (1983); Shillingford v. Holmes, 634 F.2d 263, 265 (5th Cir.1981).
 
 
 12
 We accept the district court's conclusion that, under the facts of this case, the amount of force exerted was "grossly disproportionate" to the need, and the injury relatively severe. Similarly, the facts, as decided by the court, add up to more than "mere careless or unwise excess of zeal," see Shillingford, 634 F.2d at 265. There is no legal error in the court's judgment.
 
 New Trial Motion
 
 13
 Defendants also contend that the court erroneously denied their motion for a new trial following Myers' recantation of his testimony. This contention has no merit.
 
 
 14
 The district court has discretion to grant a new trial based on newly discovered evidence. La Fever, Inc. v. All-Star Insurance Corp., 571 F.2d 1367, 1368 (5th Cir.1978). In reaching its decision, it must consider whether the new facts (1) would probably change the outcome; (2) could have been discovered earlier with due diligence; and (3) are merely cumulative or impeaching. Id.; see also English v. Mattson, 214 F.2d 406, 409 (5th Cir.1954).
 
 
 15
 We find no abuse in the court's application of this standard. It considered the three factors and acted well within its discretion in denying defendants' motion.
 
 II.
 THE 1981 INCIDENT
 
 16
 Following the 1980 knife threat, duly noted somewhere in the inches-thick "central files" of both Schwindling and Johnston, the two men were separated for some eighteen months. Then, in September 1981, Schwindling was moved to Unit 4 where Johnston was already housed. Schwindling threatened Johnston, they got into a "scuffle" in October, and Johnston complained to the Unit 4 Administrator. Schwindling also told the Administrator that he intended to harm Johnston. The Administrator then informed Jagers, whose approval was needed for all transfers between units, that Johnston should be separated from Schwindling because the two could not live together. Although Schwindling was evidently moved first for assaulting a guard, Jagers approved Johnston's transfer to Unit 24 on October 26, where he was assigned to Building C.[2]
 
 
 17
 After his release from administrative detention the following week, Schwindling was also approved for transfer to Unit 24. Remembering that he and Johnston could not live together, Jagers told someone[3] at Unit 24 to place Schwindling in the Extension. No record was made of this directive, and Jagers did not check to be sure the suggestion was carried out.
 
 
 18
 Apparently, it was not. While only Jagers and the Classification Committee could transfer inmates between units, unit officers made initial cell assignments and could effectuate transfers between buildings or cells in their unit. Schwindling was placed in Building C with Johnston; Johnston then asked to be, and was, moved to Building B, reserved for inmates with jobs in "camp support." Soon thereafter, by bribing a guard, Schwindling managed to be moved to Building B. When Johnston again asked to transfer, he was told that no one had authority to move him over the Christmas weekend. A short time later, Schwindling stabbed Johnston.[4]
 
 Jagers
 
 19
 The Classification Committee is responsible for deciding how and where every inmate will spend his time at Parchman. For practical purposes, as Committee Chairman, Jagers had final say on all inmate transfers between housing units in 1980-81. He also approved each inmate's initial classification and subsequent changes thereto, and had access to their "central files." Due to his position, he knew generally of Johnston's 1980 beating as it involved punishing Johnston and assigning him to disciplinary quarters. In the same manner, he knew of Schwindling's history of assaults. In October 1981, he was personally informed that Johnston and Schwindling, for whatever reason, could not live together, and testified that he accordingly undertook to move Johnston to Unit 24 on October 26. He approved Schwindling's transfer to the same unit less than one week later and spoke with someone at Unit 24 to advise that Schwindling should go to the Extension where he would be separated from Johnston.
 
 Lucas
 
 20
 As Warden, Lucas was responsible for day-to-day camp operations, including the design and implementation of procedures governing intra-unit inmate transfers. Unlike Jagers, Lucas testified that he had no actual knowledge of Schwindling's threats to Johnston other than the 1980 incident.
 
 Childs
 
 21
 Childs was Unit Administrator of Unit 24 from 1979 until his promotion to Program Major in November 1981, when he took charge of Unit 24 and two other units. Due to his position, he was aware of Schwindling's grudge against Johnston in 1980. Schwindling as well as Flowers personally advised Childs of the threat; it was Childs' decision to move Johnston to cell # 51. He was not informed of any subsequent problems between the two, however; at the time of Childs' promotion, Johnston, but not Schwindling, was housed in Unit 24.
 
 Disposition in Trial Court
 
 22
 The district court, pursuant to the magistrate's recommendations, held Lucas, Jagers, and Childs liable for failing to prevent the stabbing. The court found that Jagers was directly responsible for the housing assignments. Lucas and Childs, on the other hand, were responsible for failing to implement adequate procedures--Lucas, at the prison-wide level, and Childs, at the unit level--to ensure that known enemies were kept separated.
 
 
 23
 The magistrate found that these defendants were not guilty of gross neglect, or willful or wanton conduct. No objection has been made to that finding. The magistrate charged the defendants with the denial of reasonable protection required by the Eighth Amendment because of the failed procedures and classification system for which defendants were responsible.
 
 
 24
 These defendants objected to the recommendations of the magistrate on the ground that he failed to use the correct standard of callous indifference. The district judge rejected that argument, saying that subjective intent of the defendants was not an essential factor, and that their liability could be predicated upon objective unreasonableness of their conduct in failing to protect the plaintiff.
 
 Discussion
 
 25
 Despite conflicting testimony, the facts are not contested; the dispute concerns the appropriate basis for liability. Lucas, Jagers, and Childs contend that the district court erroneously held them liable when they could be faulted for no more than merely negligent conduct. Presumably with reference to Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), they argue that prison officials can violate the Eighth Amendment only if their conduct manifests conscious or callous indifference to prisoners' needs. We agree.
 
 
 26
 The Eighth Amendment affords prisoners protection against injury at the hands of other inmates. Smith v. Wade, 461 U.S. 30, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983); Stokes v. Delcambre, 710 F.2d 1120, 1124 (5th Cir.1983); Gates v. Collier, 501 F.2d 1291, 1308-10 (5th Cir.1974). Our question is the nature or standard of conduct that is required by the Eighth Amendment of prison guards and officials. The district judge may have read by our description of the constitutional right, as one of reasonable protection, to mean that reasonable care is required of guards and jailers for this purpose. But more is required. In Wright v. El Paso County Jail, 642 F.2d 134, 136 (5th Cir.1981), where the prisoner complained of the failure to protect him from attacks by fellow inmates, we stated:
 
 
 27
 In order to state a Sec. 1983 cause of action against prison officials based on a constitutional deprivation resulting from cruel and unusual punishment, there must be at least some allegation of a conscious or callous indifference to a prisoner's rights, thus raising the tort to a constitutional stature.
 
 
 28
 The Supreme Court has recently stated that "the protections of the Due Process Clause, whether procedural or substantive, are just not triggered by lack of due care by prison officials." Davidson v. Cannon, --- U.S. ----, 106 S.Ct. 668, 671, 88 L.Ed.2d 677 (1986).
 
 
 29
 The conduct of these defendants may be viewed as something more than mere negligence. Each of the prison officials bore responsibility for Johnston's danger, Jagers because he approved the transfer of Schwindling to the same unit with Johnston, and Lucas and Childs because they continued to employ procedures which were obviously inadequate. It is arguable that their default could be considered an abuse of power and an Eighth Amendment deprivation. A holding to that effect, however, would set the level of this Eighth Amendment violation to differ with both the Estelle v. Gamble test in medical need cases, as well as the standard for liability under substantive due process as stated by the Court in Davidson.
 
 
 30
 We decline to pursue this thought after receiving the most recent statement of the Supreme Court in Whitley v. Albers, --- U.S. ----, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). The Court writes:
 
 
 31
 The general requirement that an Eighth Amendment claimant allege and prove the unnecessary and wanton infliction of pain should also be applied with due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged. The deliberate indifference standard articulated in Estelle was appropriate in the context presented in that case because the State's responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities. Consequently, "deliberate indifference to a prisoner's serious illness or injury," Estelle, supra, 429 U.S. at 105, 97 S.Ct. at 291, can typically be established or disproved without the necessity of balancing competing institutional concerns for the safety of prison staff or other inmates.
 
 
 32
 --- U.S. at ----, 106 S.Ct. at 1084. We do not believe that the Court would accept a standard of conduct any lower than deliberate indifference. We therefore conclude that neither Lucas, Jagers, nor Childs was shown to be liable to the plaintiff Johnston for the reason that none of them was guilty of conscious indifference to Johnston's danger or of "wanton infliction of unnecessary pain." See Estelle, 429 U.S. at 105, 97 S.Ct. at 291.
 
 
 33
 The plaintiff complains because he was not allowed to amend his complaint to add a state tort claim against Lucas, Jagers, and Childs. This attempt to amend came at the pretrial conference, after completion of discovery and only a month prior to trial. Denial of leave to amend was not an abuse of discretion by the district judge. See Nilsen v. City of Moss Point, Miss., 621 F.2d 117, 121-22 (5th Cir.1980).
 
 
 34
 We reaffirm the rule that liability for Eighth Amendment deprivation requires the same delinquency in the denial of protection against harm from other inmates as it does for the denial of medical care. There must be at least a conscious or callous indifference to the prisoner's rights. The trial court's finding of no gross negligence or wantonness on the part of Lucas, Jagers, and Childs entails a finding that none of them was guilty of conscious indifference. We therefore reverse the judgment of the district court and remand the case to that court for entry of judgment consistent with this opinion.
 
 
 35
 AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
 
 
 
 [1]
 Three other guards were also sued. Two were dismissed during the trial and the third in the recommended findings. Those dismissals were not appealed
 
 
 [2]
 Until November 1, 1981, Unit 24 consisted of four buildings, A, B, and C, and an "Extension" which is separated by a wall from the other three buildings. After that time, the Extension may have been made a separate unit. See R. 6:557. Although a few other units at Parchman do house "C" custody inmates such as Schwindling and Johnston, within Unit 24, only building "C" and the Extension are generally used for this purpose
 
 
 [3]
 Childs had been Unit 24 Administrator when Johnston was transferred, but was promoted to Program Major, in charge of three units including 24, the day before Schwindling arrived
 Jagers first testified that he called Childs. When Childs denied this, Jagers stated that he called someone, probably the new Unit 24 Administrator. He later said that he talked to someone, but did not know who, and was uncertain who had initiated the communication.
 
 
 [4]
 As a somewhat bizarre ending to this bizarre string of coincidences, Schwindling was ordered to, but never did, serve 20 days in solitary confinement for the stabbing. Instead, apparently in error, his status was elevated from "C" to "B" and then to "A" custody, and he was made a prison trusty