REVISED - March 5, 1998

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 96-60872
_____


RICHARD HARE, Natural Father and next friend
of Haley Hare, a minor;
RICHARD HARE, Individually and in his
official capacity as administrator of
the estate of Tina Hare,

Plaintiffs-Appellees,

versus

CITY OF CORINTH, MS; ET AL.,

Defendants,


FRED JOHNSON, Individually and
in his official capacity;
BILLY CLYDE BURNS, Captain, Individually and
in his official capacity;
JAMES DAMONS, Captain, Individually and
in his official capacity;
BRENDA MOORE, Individually and
in her official capacity,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Mississippi
_____

February 12, 1998

Before JOLLY, DAVIS and BARKSDALE, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Concerning the suicide of pretrial detainee Tina Hare in July 1989, at issue in this interlocutory appeal on qualified immunity is whether, by not preventing the suicide, Appellants acted objectively unreasonably in the light of then clearly established

law.  On remand from a similar interlocutory appeal, decided by our en banc court, **Hare v. City of Corinth,** 74 F.3d 633 (5th Cir. 1996) (en banc), the district court again denied qualified immunity to the individual defendants.  We **REVERSE**.

I.

On remand, additional evidence was not presented.  The parties to this appeal agree that our en banc opinion accurately states the facts in the light most favorable to the nonmovant, Richard Hare:

> Shortly after midnight on the morning of July [4], 1989, the Booneville [Mississippi] Police Department notified the Corinth Police Department that [Tina] Hare had been arrested in Booneville on warrants for petty larceny and forgery.  Officer Larry Fuqua of the Corinth Police Department immediately went to Booneville to pick up Ms. Hare, at which time the Booneville police informed Fuqua that Ms. Hare was a "heavy drug user."  Fuqua took Ms. Hare to the Corinth City Jail, where she was jailed at approximately 1:45 a.m.
>
> Ms. Hare's husband, [Richard] Hare, testified in his deposition that Ms. Hare called him just after she was jailed.  Mr. Hare testified that his wife had never been in jail before, and that she seemed scared and frightened.  Ms. Hare told her husband that nothing could be done to secure her release until after 8:00 a.m., so he went back to sleep.  Later that morning, at around 6:00 a.m., Mr. Hare contacted Ms. Hare's divorced parents, Guy Taylor and Patricia Morgan, to inform them that their daughter was in the Corinth jail and needed help.  Shortly thereafter, Mr. Hare met with Ms. Hare's parents; they decided that Ms. Hare's parents would go to the jail at 8:00 a.m. to seek their daughter's release, leaving Mr. Hare at home to care for the Hares' baby daughter.  When Ms. Hare's parents went to the jail at around 8:00 a.m., however, [Captain Billy Clyde] Burns [of the Corinth Police Department] told them that Ms. Hare was not ready for release, and that it would take more

time to complete the investigation of their daughter. Accordingly, Burns told the parents to return home and wait for his call.

In his deposition, Burns testified that he was informed that Ms. Hare was a suspect in a check forgery case, and that he first met with Ms. Hare to interview her at approximately 10:00 a.m. on July [4], 1989. During this interview, Ms. Hare told Burns that she had been forging checks and cashing them to finance her dilaudid addiction. According to Burns, Ms. Hare was depressed about being in jail, and was sitting with both feet in her chair in a defensive, "fetal-type" position. Ms. Hare said that she was an unfit mother and expressed concern about how her husband would react to her predicament. Burns observed that Ms. Hare was going through withdrawal, which he understood to be a normal reaction to her drug use; he also learned at that time that Ms. Hare was scheduled to enter a drug rehabilitation program the next day, July [5], 1989, in Tupelo, Mississippi. Burns indicated that Ms. Hare's mood improved later in the interview when she learned that her bond amount would not be as high as she initially had expected.

After the interview, Burns placed Ms. Hare in a private cell and told the dispatcher, Brenda Moore, to monitor Ms. Hare in case her withdrawal symptoms required medical attention. Ms. Hare was allowed to call her parents to ask them to return to the jail to assist with her bond so that she could be released that afternoon. These plans never materialized, apparently in part because of Burns' displeasure over Ms. Hare's attempt to destroy a videotape on which the interview had been recorded. Also, in the meantime, the Corinth police had received word of additional charges on Ms. Hare. When Ms. Hare's parents arrived at the jail at around noon, Burns told them that Ms. Hare could not go home at that time.

Though Ms. Hare was not released, she was allowed to visit with her parents from around 2:00 p.m. to 3:00 p.m. During this private meeting, Ms. Hare's mother described Ms. Hare as "emotionally distraught." Burns likewise

described Ms. Hare's mood as "hyper" and "frantic" while her parents were at the jail. Ms. Hare attempted to convince Burns not to hold her in jail another night and threatened to commit suicide if he did. While Burns did not consider the threat serious, Ms. Hare's father testified that he believed that she was serious, observing that she had made the suicide threat in a serious, believable tone of voice. Burns acknowledged that it was possible that Ms. Hare said to him that "her life was in his hands," but said that he could not specifically remember whether she said those words to him. In any event, Ms. Hare's threat prompted her father to seek assurance from Burns that Ms. Hare would be safe. Burns acknowledges telling Ms. Hare's father that the police would do "everything within [their] power to make sure that nothing did happen to her."

After Ms. Hare's parents left the jail, Burns returned Ms. Hare to her original cell. Burns subsequently moved her to an isolated cell nearest the camera monitors and trusty station, claiming that Police Chief Fred Johnson instructed him to do so. Johnson denies that he ever gave Burns such an instruction. Since Ms. Hare had been strip-searched previously, Burns searched her cell, took her shoes, and made sure that she did not have a belt. Burns saw a blanket on the bunk and considered the possibility that Ms. Hare might use it to harm herself, but left it there believing that she was not strong enough to tear it. Burns instructed dispatcher Moore to keep a close check on Ms. Hare and to have the trusties check on her. Accordingly to Burns, his primary concern was Ms. Hare's "withdrawal syndrome," not her suicide threat.

Moore confirms that Burns told her to keep an eye on Ms. Hare, and that he also apprised her of Ms. Hare's threat to harm herself. Burns, however, believed that Moore would be on duty until 10:00 p.m., when in fact she was off duty at 5:00 p.m. Moore thus went home at 5:00 p.m., at which time Captain James Damons took over her dispatching duties. Moore claims that she informed Damons that Burns had left instructions to keep an eye on

Ms. Hare, though Damons denies receiving such information.

Burns left the station some time after 3:00 p.m. At around 6:00 p.m., Burns called the jail from his home and told Damons to have the two trusties check on Ms. Hare at least every forty-five minutes. Damons promptly sent a trusty to check on Ms. Hare. When the trusty arrived at Ms. Hare's cell, he found her hanging from the bars of her cell with a noose that she had fashioned from strips of the blanket. As the trusty did not have a key to Ms. Hare's cell, he immediately notified Damons. Damons, in accordance with jail procedures, could not leave his post, so he called Burns. Ms. Hare was left there hanging, though the summary judgment evidence does not establish whether she was alive or dead when the trusty first found her. Burns told Damons to leave Ms. Hare undisturbed until the State Investigator arrived.

*Hare*, 74 F.3d at 636-38.

Pursuant to 42 U.S.C. § 1983, Richard Hare sued the City of Corinth, as well as the individual defendants bringing this appeal, alleging that, *inter alia*, they were deliberately indifferent to the risk of Tina Hare's suicide. The district court denied summary judgment, *Hare v. City of Corinth*, 814 F. Supp. 1312, 1314 (N.D. Miss. 1993), and the individual defendants appealed, asserting qualified immunity.

Our court's original panel opinion held that Richard Hare had alleged a violation of the clearly established right to medical attention for suicidal tendencies, and that material fact issues remained as to whether the individual defendants were deliberately indifferent. *Hare v. City of Corinth,* 22 F.3d 612 (5th Cir. 1994), *withdrawn and superseded on rehearing by* 36 F.3d 412 (5th Cir. 1994), *on rehearing en banc*, 74 F.3d 633 (5th Cir. 1996), *on*

- 5 -

*remand*, 949 F. Supp. 456 (N.D. Miss. 1996). However, that panel revised its opinion, holding: (1) that "the jail officials were under a clearly established constitutional duty to provide pretrial detainees with reasonable care for serious medical needs, unless the deficiency reasonably served a legitimate governmental objective"; and (2) that a material fact issue existed as to whether the jail officials "knew or should have known of Tina Hare's vulnerability to suicide". ***Hare,*** 36 F.3d at 415-17, *on rehearing en banc*, 74 F.3d 633, *on remand*, 949 F. Supp. 456.

Our court took this case en banc, for the following reasons stated in the resulting opinion, and held:

> As our cases suggest, we have traveled a peripatetic route in invoking different measures of the constitutional rights of pretrial detainees to medical care and protection from harm. Close analysis, however, discloses much consistency in our treatment of the underlying constitutional claims. Our goal in deciding this case today is to clarify our case law and to articulate the proper legal measure of a State's duty to tend to a pretrial detainee posing a risk of suicide.
>
> * * *
>
> [W]e conclude that a state jail official's constitutional liability to pretrial detainees for episodic acts or omissions should be measured by a standard of subjective deliberate indifference as enunciated by the Supreme Court in ***Farmer*** [***v. Brennan***, 511 U.S. 825 (1994)].

***Hare***, 74 F.3d at 643. This holding is restated at the conclusion of the opinion:

> In sum, we hold (1) that the State owes the same duty under the Due Process Clause and the Eighth Amendment to provide both pretrial

- 6 -

> detainees and convicted inmates with basic human needs, including medical care and protection from harm, during their confinement; and (2) *that a state jail official's liability for episodic acts or omissions cannot attach unless the official had subjective knowledge of a substantial risk of serious harm to a pretrial detainee but responded with deliberate indifference to that risk.*

*Id*. at 650 (emphasis added).

Accordingly, this case was remanded to the district court with the following instructions:

> Richard Hare alleges that the defendants violated the Due Process Clause of the Fourteenth Amendment by causing Tina Hare to be deprived of her right to reasonable care. The district court found that there was a genuine issue of material fact as to whether the defendants knew or should have known of Ms. Hare's suicide risk. *As we have explained, however, the correct legal standard is not whether the jail officers "knew or should have known," but whether they had gained actual knowledge of the substantial risk of suicide and responded with deliberate indifference.* This appeal comes from a denial of summary judgment rejecting qualified immunity. We remand for application of the standard announced today. *See **Rankin v. Klevenhagen***, 5 F.3d 103, 105 (5th Cir. 1993). We express no opinion regarding the outcome of such further proceedings in the trial court.

*Id*. (Emphasis added).

As noted, additional evidence was not presented on remand. The district court again denied summary judgment, both on the merits *and* on qualified immunity, holding that material fact issues remained as to whether the individual defendants had subjective knowledge of the risk of Tina Hare's suicide and whether they acted

with deliberate indifference to that risk.  ***Hare,*** 949 F. Supp. at 460-66.

## II.

The denial of summary judgment on qualified immunity is, of course, immediately appealable, even when a genuine issue of material fact exists, when the order determines a question of law. *E.g.,* ***Wren v. Towe***, No. 96-11388, slip op. at 1193 (5th Cir. Dec. 30, 1997) ("A district court's denial of summary judgment is not immune from interlocutory appeal simply because the denial rested on the fact that a dispute over material issues of fact exists.") (citation omitted); ***Coleman v. Houston Indep. Sch. Dist.***, 113 F.3d 528, 531 (5th Cir. 1997) (discussing ***Behrens v. Pelletier***, 516 U.S. 299 (1996)).

Along this line, Richard Hare moved to dismiss this appeal. In an unpublished opinion, our court held:

> We conclude that these [individual] defendants have a right to an interlocutory appeal to assert their qualified-immunity defense because they are challenging the district court's legal reasoning rather than merely its factual findings.
>
> * * *
>
> They are not arguing, for example, that there was insufficient summary judgment evidence for the district court to permit a jury to conclude that they left Ms. Hare with the blanket that she used to hang herself.  They claim not that they didn't do it, but that even if they did it, it didn't violate a clearly established constitutional right and thus doesn't defeat their immunity.

***Hare v. City of Corinth***, No. 96-60872, at 2, 6 (5th Cir. filed Mar. 31, 1997) (unpublished).

It bears repeating that this appeal is brought *only* by the individual officers, *not* the City of Corinth, concerning *only* qualified immunity, *not* the merits. And, it is well to remember that qualified immunity serves a number of quite important goals. Courts have expressed a concern over "the deterrent effect that civil liability may have on the willingness of public officials to fully discharge their professional duties". ***Sanchez v. Swyden***, No. 96-40557, slip op. at 1390-91 (5th Cir. Jan. 13, 1998) (citing ***Pierson v. Ray***, 386 U.S. 547, 555 (1967); ***Anderson v. Creighton***, 483 U.S. 635, 638 (1987); ***Harlow v. Fitzgerald***, 457 U.S. 800, 814 (1982); and ***Scheuer v. Rhodes***, 416 U.S. 232, 239-41 (1974)). Moreover, we seek to "avoid excessive disruption of government". ***Malley v. Briggs***, 475 U.S. 335, 341 (1986). To this end, qualified immunity serves to terminate a claim against a public official as soon as possible in a judicial proceeding, even before discovery. *See* ***Siegert v. Gilley***, 500 U.S. 226, 232 (1991) ("'Until this threshold [qualified] immunity question is resolved, discovery should not be allowed.'") (quoting ***Harlow***, 457 U.S. at 818).

"Decision of this *purely legal question* [of qualified immunity] permits courts expeditiously to weed out suits which fail the test without requiring a defendant who rightly claims qualified immunity to engage in expensive and time consuming preparation to defend the suit on its merits." ***Siegert***, 500 U.S. at 232 (emphasis added). "One of the purposes of immunity, absolute or qualified,

is to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit." *Id.* Accordingly, the doctrine of qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law". *Malley*, 475 U.S. at 335. Needless to say, some of these goals are not reflected in the instant case; the issue of qualified immunity is still unresolved more than six years after the complaint was filed.

The bifurcated test for qualified immunity is quite familiar: (1) whether the plaintiff has alleged a violation of a clearly established constitutional right; and, (2) if so, whether the defendant's conduct was objectively unreasonable in the light of the clearly established law at the time of the incident. *E.g., Colston v. Barnhart*, 130 F.3d 96, 99 (5th Cir. 1997). It goes without saying that we review a summary judgment *de novo*, viewing the evidence in the light most favorable to the nonmovant. *E.g., Abbott v. Equity Group, Inc.*, 2 F.3d 613, 618-19 (5th Cir. 1993).

A.

Again, the first step is to determine whether the plaintiff has alleged "violation of a clearly established constitutional right". *Siegert*, 500 U.S. at 231. *E.g., White v. Taylor*, 959 F.2d 539, 545 n.4 (5th Cir. 1992) ("We have interpreted *Siegert* to require that we examine whether the plaintiff has stated a claim for a constitutional violation before reaching the issue of qualified immunity."); *Connelly v. Comptroller of the Currency*, 876 F.2d 1209, 1212 (5th Cir. 1989) ("It is a common failing in

- 10 -

qualified immunity decisions that courts avoid deciding exactly what constitutional violation might have occurred if the facts are as a plaintiff alleged.... The purpose of requiring careful characterization of plaintiff's claim at the outset of a qualified immunity analysis is to effectuate the goal of that defense"). This analysis is made under the "currently applicable constitutional standards". *Rankin v. Klevenhagen*, 5 F.3d 103, 106 (5th Cir. 1993).

Richard Hare claims that the individual defendants "violated the Due Process Clause of the Fourteenth Amendment by causing Tina Hare to be deprived of her right to reasonable care". *Hare*, 74 F.3d at 650. Appellants counter that there is no duty to diagnose her with a mental illness that would trigger a duty to protect her from suicide. And, again, our en banc opinion stated:

> We hold that the episodic act or omission of a state jail official does not violate a pretrial detainee's constitutional right to be secure in his basic human needs, such as medical care and safety, unless the detainee demonstrates that the official acted or failed to act with deliberate indifference to the detainee's needs.

*Id*. at 647-48.

Richard Hare has consistently alleged that the individual defendants knew, or should have known, that Tina Hare was exhibiting suicidal tendencies, and that the defendant's actions, and inactions, by, *inter alia*, placing Tina Hare in an isolated cell, without removing the blanket, constituted deliberate indifference to Tina Hare's serious medical/psychiatric needs. Therefore, pursuant to the standard established by our en banc

opinion, Richard Hare has alleged the violation of a clearly established constitutional right.

### B.

The second prong of the qualified immunity test is better understood as two separate inquiries: whether the allegedly violated constitutional rights were *clearly established at the time of the incident*; and, if so, whether the conduct of the defendants was objectively unreasonable in the light of that then clearly established law. *See **Pierce v. Smith***, 117 F.3d 866 (5th Cir. 1997); ***Rankin***, 5 F.3d at 108 ("When evaluating whether a plaintiff *stated* a constitutional violation, we looked to currently applicable constitutional standards. However, the objective reasonableness of an official's conduct must be measured with reference to the law *as it existed* at the time of the conduct in question.") (internal quotes and citations omitted) (emphasis added).

### 1.

As discussed fully in our en banc opinion, review of the case law as of the time of the incident, July 1989, reveals that the standard of care owed to pretrial detainees, in protection of their due process right to medical care or protection from harm, was confused and often conflicting. *See generally **Hare***, 74 F.3d at 639-43 (detailing the relevant case law on this issue prior to the en banc opinion). We revisit it briefly.

In **Bell v. Wolfish**, 441 U.S. 520, 539 (1979), the Court provided the following standard to be applied in a case involving a pretrial detainee's due process rights:

> [I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.' Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

This standard is contrasted with the requirement of "deliberate indifference", which has been employed in cases involving *prisoner* claims of Eighth Amendment violations due to denial or interference with medical needs. **Estelle v. Gamble**, 429 U.S. 97, 104-05 (1976). This was explained in our en banc opinion in **Hare**:

> When dealing with a pretrial detainee's right to medical care or protection from harm, it is argued, we must apply the reasonable relationship test of **Bell**, since that test was designed specifically to define the scope of due process rights of pretrial detainees. With equal fervor it is urged that the deliberate indifference standard applied in the Court's Eighth Amendment cases ought to be the choice, since those cases have addressed the specific type of right asserted in this case—the right to medical care or protection from harm.

74 F.3d at 640.

The case law in this circuit in the decade following **Bell** and **Estelle** did little to clarify the proper standard in pretrial detainee suicide cases. **Johnston v. Lucas**, 786 F.2d 1254 (5th Cir.

1986), held that a prisoner must show that the jailers acted with "conscious or callous indifference" to their duty to protect the prisoner from others. Shortly after *Lucas*, we held that, in cases involving claims by a pretrial detainee under the Eighth Amendment right to be free from the constant threat of harm by fellow inmates, "[t]he same conditions of violence and sexual abuse which constitute cruel and unusual punishment may also render the confinement of pretrial detainees punishment per se." *Alberti v. Klevenhagen*, 790 F.2d 1220, 1224 (5th Cir. 1986).

Finally, in *Partridge v. Two Unknown Police Officers*, 791 F.2d 1182 (5th Cir. 1986), our court was presented with a case involving a pretrial detainee suicide. We held that, under *Bell*, "the defendants had a duty, *at a minimum*, not to be deliberately indifferent to [the pretrial detainee's] serious medical needs". *Id*. at 1187 (emphasis added). This decision clearly held that negligence is an insufficient basis on which to state a claim, and pointed to a standard of deliberate indifference to a pretrial detainee's medical needs. However, the applicable standard was again obfuscated by our decision in *Cupit v. Jones*, 835 F.2d 82, 85 (5th Cir. 1987), which signaled a return to the *Bell* test by requiring that an official's failure to provide reasonable medical care must be "reasonably related to a legitimate governmental objective".

These cases show that the parameters of the law in 1989 were far from clearly defined. But, on the other hand, they demonstrate that it was clearly established that, *at a minimum*, the standard of

- 14 -

care was as described in our 1996 en banc opinion in this case. *See **Hare***, 949 F. Supp. at 464 ("[T]he duty of law enforcement officials not to be deliberately indifferent to serious medical needs of pre-trial detainees has long since been the minimum duty owed to a pre-trial detainee.") (citing as authority ***Estelle***, 429 U.S. 97; ***Bell***, 441 U.S. at 535 n.16; ***City of Revere v. Massachusetts Gen. Hosp.***, 463 U.S. 239, 244 (1983); ***Jones v. Diamond***, 636 F.2d 1364, 1378 (5th Cir. 1981), *overruled on other grounds by **International Woodworkers of Am., AFL-CIO and its Local No. 5-376 v. Champion Int'l. Corp.,*** 790 F.2d 1174 (5th Cir. 1986); and ***Partridge***, 791 F.2d at 1187).

Therefore, the deliberate indifference test enunciated in our 1996 en banc opinion was a clearly established minimum standard of conduct when the incident occurred in 1989.  In other words, at the very least, that standard was clearly established as of then. Therefore, it is that standard to which we hold the individual defendants in determining, objectively, the reasonableness of their conduct.  *See **Anderson***, 483 U.S. at 640 ("[T]he 'contours' of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."); ***Sanchez***, No.96-40557, slip op. at 1390 ("[T]he official's knowledge of the relevant law need not rise to the level of a 'constitutional scholar.'") (citing ***Harlow***, 457 U.S. at 815-17).

2.

Accordingly, we turn to whether the conduct of the individual defendants was objectively reasonable in the light of the then

- 15 -

clearly established law.  *E.g., Rankin*, 5 F.3d at 108; *Spann v. Rainey*, 987 F.2d 1110, 1114 (5th Cir. 1993).  "The stated purpose underlying adoption of an *objective* test was to 'permit the resolution of many insubstantial claims on summary judgment' and to avoid 'subject[ing] government officials either to the costs of trial or to the burdens of broad-reaching discovery' in cases in which the legal norms the officials are alleged to have violated were not clearly established at the time the events occurred." *Lynch v. Cannatella*, 810 F.2d 1363, 1374 (5th Cir. 1987) (citing *Harlow,* 457 U.S. at 817-18) (emphasis added).

On this appeal, objective reasonableness has been confused with the separate subjective standard of deliberate indifference. This is understandable.  As the district court recognized, other courts have experienced difficulty determining the relationship between these two standards in the context of qualified immunity. *See, e.g., Scott v. Abate*, No. CV-93-4589, 1995 WL 591306, at *10 n.5 (E.D.N.Y. Sept. 27, 1995) ("It is ... difficult to imagine factual circumstances in which a trier of fact could find deliberate indifference as defined by *Farmer* and nevertheless conclude that a reasonable person in [the] defendant's position was not chargeable with knowledge that his or her actions violated the plaintiff's clearly established constitutional rights.") (quoting *Briecke v. Coughlin*, No. 92-CV-1211, 1994 WL 705328, at *6 (N.D.N.Y. Dec. 16, 1994)).

Again, this appeal is brought only by the individual officers, not the City of Corinth, contesting the qualified immunity denial,

not the merits.  And, again, in addressing qualified immunity, the test is *objective reasonableness*.  And, again, objective reasonableness is a question of law for the court.  *E.g., **Mangieri v. Clifton***, 29 F.3d 1012, 1016 (5th Cir. 1994) ("[I]n evaluating a claim of qualified immunity, the district court is to make a determination of the objective reasonableness of the official's act as a matter of law.")

Obviously, the analysis for objective reasonableness is different from that for deliberate indifference (the subjective test for addressing the merits).  Otherwise, a successful claim of qualified immunity in this context would require defendants to demonstrate that they prevail on the merits, thus rendering qualified immunity an empty doctrine.  *See **Hart v. O'Brien***, 127 F.3d 424, 454 (5th Cir. 1997) ("A public official who attacks a plaintiff's ability to prove her case is not raising a qualified immunity defense, which is 'conceptually distinct from the merits of the plaintiff's claim.'") (quoting ***Johnson v. Jones***, 515 U.S. 304, 314 (1995)).

Accordingly, for this appeal on qualified immunity, the subjective deliberate indifference standard serves only to demonstrate the clearly established law in effect at the time of the incident, as discussed *supra*.  And, under that standard — the minimum standard not to be deliberately indifferent — the actions of the individual defendants are examined to determine whether, as a matter of law, they were *objectively* unreasonable.

Officer Burns was present at a meeting between Tina Hare and her parents, at which Tina Hare threatened suicide. Officer Burns placed her in the private cell closest to the monitor and the trusty's station, searched the cell, ensured that Tina Hare did not have a belt, and removed her shoes because they had laces. Officer Burns did not remove the blanket from the cell because he believed that Tina Hare, who weighed only approximately 100 pounds, was not strong enough to tear it. Officer Burns instructed Officer Moore to keep a close check on Tina Hare. On the afternoon of the suicide, Appellants, or the jail trusties, checked on Tina Hare when she went to her cell at 3:00 p.m., when Officer Damons came on duty at 4:00 p.m., when Tina Hare was fed at 5:00 p.m., and when Officer Burns called at 6:00 p.m. Moreover, the only evidence in the record concerning Tina Hare's physical state when she was found is Officer Burn's report, which states that Officer Damons reported that she was dead.[1]

---

[1] Richard Hare contends that the failure to check Tina Hare's pulse or body temperature when she was found hanging in the cell could, by itself, allow a reasonable juror to find that the defendants were deliberately indifferent to Tina Hare's medical needs. This contention was not made in the pleadings. In fact, the complaint alleges that Tina Hare was found hanging in her cell at approximately 6:00 p.m. on 4 July 1989, but that she "died at approximately 5:30 p.m. ... while in the custody of the Defendants". The only reference whatsoever in the record vis-a-vis this argument is in the plaintiff's motion to amend the pretrial order to include a conflict of law as to "[w]hether the Constitution requires a municipality or its employees to ensure that inmates receive care for their serious medical needs, specifically, emergency care for inmates discovered hanging in their cells." Because Richard Hare did not make this contention in district court in response to the summary judgment motion, much less present any supporting evidence, it is not properly presented on appeal.

Needless to say, in this context, the objective reasonableness standard does not afford a simple bright-line test.  *See*, *e.g.*, **Rellergert v. Cape Girardeau County**, 924 F.2d 794, 797 (8th Cir. 1991) ("While we conclude that the law is clearly established that jailers must take measures to prevent inmate suicides once they know of the suicide risk, we cannot say that the law is established with any clarity as to what those measures must be.").  However, we conclude that, against the backdrop of the deliberate indifference standard enunciated in the en banc opinion, which was the only clearly established standard in 1989, the actions of the individual defendants are within the parameters of objective reasonableness. *Cf.* **Rhyne v. Henderson County**, 973 F.2d 386, 393 (5th Cir. 1992) (holding that giving a blanket to an inmate who had twice attempted suicide and was diagnosed as suicidal, and not placing the inmate under continuous observation, is not a constitutional violation); **State Bank of St. Charles v. Camic**, 712 F.2d 1140, 1146 (7th Cir.) (removing belt and shoelaces were "reasonable precautions" even though inmate was placed in a cell not visible from the booking area and later hanged himself with his shirt), *cert. denied*, 464 U.S. 995 (1983); **Popham v. City of Talladega**, 908 F.2d 1561, 1564 (11th Cir. 1990) (holding that removing shoes and ensuring detainee had no belt demonstrate a lack of deliberate indifference); **Schmelz v. Monroe County**, 954 F.2d 1540, 1545 (11th Cir. 1992) (finding no deliberate indifference when officers failed to remove a blanket as part of a suicide watch, even though the detainee had previously

requested to see the jail psychologist, because such conduct "can be characterized at best as mere negligence").

It is important to underline our narrow holding: we do not address arguments concerning the material fact issues designated by the district court. Instead, we hold that the undisputed facts, viewed in the light most favorable to the nonmovant, do not constitute objectively unreasonable conduct when applied against the deliberate indifference standard.

In this regard, it should be noted that our holding does not insulate all public officials from liability for suicides by pretrial detainees. Based on evidence that an officer was subjectively, deliberately indifferent, as described in our en banc opinion, the objective reasonableness analysis may well result in that officer not being entitled to qualified immunity. It goes without saying that each case will turn on the evidence to which the objective standard is applied. On the other hand, as discussed, and where appropriate, qualified immunity serves important purposes by terminating an action early in the proceedings. *E.g, **Hunter v. Bryant***, 502 U.S. 224, 227 (1991) ("Immunity ordinarily should be decided by the court long before trial.").

### III.

In sum, as a matter of law, the district court should have granted summary judgment to Appellants on qualified immunity

grounds.[2] Accordingly, the denial of summary judgment is **REVERSED** as to Appellants; judgment is **RENDERED** for them; and this matter is **REMANDED** for further proceedings.

---

[2]    Obviously, the sanctions sought against Appellants for claimed undue delay and frivolousness of the appeal are **DENIED.**