# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-20435

United States Court of Appeals
Fifth Circuit

**FILED**

February 25, 2019

Lyle W. Cayce
Clerk

STEVEN KURT BAUGHMAN,

Plaintiff - Appellant

v.

DOCTOR MICHAEL SEALE; M. GUICE; DOCTOR LAMBI; DOCTOR HOWARD; DETENTION OFFICER J. RAMIREZ; DETENTION OFFICER M. Z. SACKS; DRAKE NARENDORF; NURSE SCOTT; KATHY ROSSI; EL FRANCO LEE; HARRIS COUNTY; BOBBY DAVIS,

Defendants - Appellees

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:14-CV-3164

Before HIGGINBOTHAM, ELROD, and HO, Circuit Judges.

PER CURIAM:*

A parolee arrested and held in pretrial detainment brings this action alleging constitutional violations and torts arising from jail officials' management of his diabetes, as well as alleged retaliation. The detainee appeals pro se the district court's grant of summary judgment to the defendant

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

## No. 17-20435

jail officials and to Harris County. We affirm the district court, deny the motion for appointment of counsel, and dismiss the case.

### I.

Steven Baughman is a pretrial detainee at the Harris County Jail, the third largest jail in the United States, housing almost 10,000 individuals. The Jail's Health Services Division is responsible for Baughman's medical care. The Division operates several clinics for specialized care, including a Chronic Care Clinic, which provides care for, among other conditions, type 2 diabetes. Baughman is among the Jail's 105 to 120 inmates requiring care for diabetes.

### A.

Type 2 diabetes is a disease of the endocrine system in which the pancreas does not produce adequate amounts of insulin, a hormone that lowers blood-glucose concentrations to maintain the normal range of 60 to 100 mg/dL.[1] When blood-glucose concentrations rise above this normal range, a person experiences a condition known as hyperglycemia, which can result in heart attack, stroke, loss of eyesight, kidney failure, diabetic coma, and death. A diabetic's blood-glucose levels must be regulated by treatment, specifically, with injections of insulin or oral drugs such as metformin, glyburide, and glipizide. Diabetics often receive these drugs in connection with meals, when blood glucose is boosted by food consumption.

While diabetic treatment is primarily aimed to prevent hyperglycemia, patients also must avoid excessively low levels of blood glucose. If concentrations fall below 60 mg/dL, a person experiences a condition known as hypoglycemia. Initially, hypoglycemia presents with sweatiness, jitters,

---

[1] Baughman's expert, Dr. David H. Madoff described the optimal fasting blood-glucose level as between 80 and 130 mg/dL.

No. 17-20435

fatigue, and dizziness. If left untreated, however, the situation can devolve into "severe hypoglycemia," a situation in which the diabetic patient requires assistance. Untreated, it can result in disorientation, seizures, brain damage, and even coma or death. Hypoglycemia is affected by the patient's balance of three variables: diet, specifically carbohydrate intake; physical activity; and drug dosage. If a patient's blood-glucose level is unexpectedly low, a normal insulin dose can trigger hypoglycemia. So, diabetics often keep sugary foods or glucose tablets ready to hand, to raise blood-glucose levels if their treatment unexpectedly triggers hypoglycemia.

To keep blood-glucose levels within the normal range, when diabetics use drugs like insulin they must know the status of their current blood-glucose levels, assessing the need for an increase or decrease. Many diabetics, particularly those who have lived with the condition for at least two years, have developed the ability to sense low blood-glucose levels, feeling telltale dizziness or shakiness. Where they feel these symptoms, diabetics may decline a scheduled insulin dose, so as not to lower blood-glucose levels, or they may consume a sugary food to raise blood-glucose levels into the normal range.

While a diabetic may sense a low blood-glucose level, there are technologies that offer more precise measurement. One is the A1C hemoglobin test, a blood test which measures a patient's average blood-glucose level over the preceding seven- to twelve-week period. Another method is the "fingerstick test," a device which pricks the patient's finger to draw a drop of blood, applies the blood to a test strip, and quantifies the current blood-glucose level. Outside jail, fingerstick tests are usually self-administered. Since blood-glucose levels can fluctuate, a combination of the A1C hemoglobin test and periodic fingerstick measurements allow a medical provider to define patterns of blood-glucose variability, and in light of these patterns adjust diabetes-drug regimens to keep a patient within the normal range.

3

No. 17-20435

More frequent measurement allows for a more detailed understanding of blood-glucose patterns. Accordingly, many professional sources recommend daily of use of blood-glucose tests. The Federal Bureau of Prisons' Clinical Practice Guidelines states that "[f]requent monitoring of blood glucose (three times per day) is optimal for most patients with . . . type 2 diabetes who are on insulin." The American Diabetes Association's Position Statement on diabetes management in correctional institutions likewise insists that "[p]atients with type 2 diabetes need to monitor at least once daily, and more frequently based on their medical plan," although "frequency of monitoring will vary by patients' glycemic control and diabetes regimes." The Institute for Clinical Systems Improvement, an organization that compiles medical care guidelines, recommends that "[p]atients using multiple insulin injections perform [self-monitoring of blood glucose] three or more times daily," although it adds that frequent testing is particularly important where the patient is "using glucose to guide mealtime insulin dosing."

**B.**

At the Harris County Jail, nurses circulate with an insulin cart to diabetic inmates' cells twice a day, first around 3–4 a.m., and then again around 3–4 p.m. The carts carry insulin and oranges or apples, which are provided to inmates for consumption if they feel their glucose levels are too low. Though not on the carts, medical staff have glucose tablets for patients as needed. Another nurse circulates among the patients with a fingerstick testing device. Nurses administer insulin injections and undertake fingerstick testing as assigned by a list provided by the Jail's licensed doctors and nurse practitioners ("medical providers"), specifying which patients are to receive which treatment or test on each round.

The Jail has no universal requirement regarding the frequency of fingerstick testing. The frequency of testing is governed in the first instance by

the medical provider's clinical judgment as to a patient's needs, although as will be seen, this judgment is not the final word. The Jail's former Executive Medical Director, Dr. Michael Seale, and its current interim Executive Medical Director, Dr. Marcus Guice, concede that the Jail's delegation of fingerstick testing frequency to medical providers can—and does—result in less frequent testing than recommended by the Federal Bureau of Prisons, American Diabetes Association, and Institute for Clinical Systems Improvement. Sharon Lambi, a physician assistant in the Chronic Care Clinic, describes thrice daily fingerstick tests as the standard of care. Seale, however, states that professional bodies' recommendations are not generalizable to jails where inmates are subject to 24-hour monitoring, diet is regular and largely controlled. That is, more frequent testing may be an optimal, but not a necessary, precondition to the effective and safe management of type 2 diabetes. The record is unclear on whether budgetary or logistical constraints would have limited the Jail from providing thrice daily fingerstick tests to all type 2 diabetic inmates.

The Jail's use of fingerstick testing is one part of a larger system of inmate diabetes management. When a diabetic inmate first arrives at the Jail, medical providers assess the insulin regimen that the detainee followed prior to coming to the Jail. Providers test patterns in the individual's blood-glucose variability, and prescribe a treatment regimen. In prescribing insulin dosages and schedules, providers also consider the patterns of Jail life: patients are served meals at regular times. Patients can receive guidance from a dietician and can be prescribed diets tailored to their condition. Patients can purchase food items from the commissary; however, where these choices interfere with treatment, providers have discretion to impose commissary restrictions.

Following intake, patients receive regular evaluation. If the patient is managing his diabetes well, the providers will see the patient a minimum of

once every three months; if the patient's diabetes management is less successful, providers will see the patient more often, with no limit to the frequency of appointments. With these evaluations, medical providers measure A1C hemoglobin levels and order a series of fingerstick tests (twice a day for three consecutive days) to gather data needed to evaluate appropriateness of a patient's insulin regimen. Providers retain the discretion to order additional fingerstick testing where they feel it clinically necessary to reevaluate a patient's insulin regimen. Additionally, if a patient needed insulin injections or testing more frequently than could be provided by the circulating nurses, medical providers can place the patient in the Jail's infirmary for more intensive treatment.

Medical providers' prescriptions are the starting point for diabetes management, but nurses and patients also have input. The Jail's circulating nurses exercise discretion in administering insulin injections. During their rounds, where they judge that a patient's blood-glucose levels might not be high enough to allow for safe administration, they can refuse to administer the injection. Patients also exercise discretion in their care. The patient can decline an insulin injection where he feels hypoglycemic, or alternatively can consume the glucose-rich foods provided by the insulin cart—oranges or apples—where he senses the onset of hypoglycemic symptoms. Where a patient declines an insulin injection, the administering nurse will report the refusal to the Clinic; a medical provider will decide whether in light of the refusal the patient should be administered a fingerstick test for a more precise quantification of glucose. In addition to declining drugs, patients can also request to be seen at the Chronic Care Clinic outside of regular appointment hours, or seek more immediate care from the Jail's general clinic, where diabetic patients reporting hypoglycemia are treated immediately. The patient's ability to request treatment is not restricted to the daily rounds: medical staff are available at

all times. A patient can request additional blood-glucose testing in two ways. First, the patient can simply request the test from the nurse making the rounds with the fingerstick device; the nurse provides the test at his or her discretion. The patient can also submit a "sick call" request, an official form routed to one of the Jail's medical providers for evaluation and approval.

The Harris County Jail has been accredited by the National Commission of Correctional Health Care (NCCHC) since 1985. As part of the accreditation process, the NCCHC evaluates all of the Jail's health policies—including its use of fingerstick tests—and monitors via on-site surveys every three years. On summary judgment, Baughman casted doubt on the meaningfulness of the NCCHC's approval, pointing to damning reports of inadequate medical care at the Jail during the period of accreditation. Specifically, in 2009, while the Jail was NCCHC accredited, the Department of Justice issued a report critical of the Jail's provision of medical care, including for diabetes. The Report specifically discusses failures to diagnose diabetic inmates, failures to respond to diabetic emergencies, and a complete absence of a chronic care program. It appears from the record that at least some of the problems identified by the Report had been addressed before Baughman arrived at the Jail, and Baughman does not argue that the Report identifies problems applicable to his care.

## C.

While on parole, Baughman was arrested on suspicion of participation in an aggravated assault with a deadly weapon, and arrived at the Jail on April 3, 2014 to await trial.[2] Baughman suffered from numerous health problems including obesity—he weighed 376 pounds—and type 2 diabetes. Baughman

---

[2] At the time of the district court's determination of the summary judgment motions, Baughman was still in pretrial detention at the Jail.

alleges that he is a "brittle" diabetic, meaning that his blood-glucose levels fluctuate widely over the long and short term.[3] Some of Baughman's diabetic caregivers characterize him as a stable diabetic, but his treatment history indicates that his blood-glucose levels were not in control, repeatedly exceeding the normal range. Upon his arrival, the Jail's Chronic Care Clinic considered Baughman's previous diabetic management regimen, tested his blood-glucose levels, and prescribed twice daily insulin injections.

Baughman's expert witness, Dr. David H. Madoff, an endocrinologist, opines that "within a reasonable degree of medical certainty, it [wa]s essential for Baughman's health and safety for HCSOJ to provide him with glucose monitoring a minimum of three times daily." This is because, Madoff says, "Mr. Baughman's healthcare team needs to know in a timely fashion if he is having either high or low blood sugars (hyperglycemia or hypoglycemia) to adjust his insulin doses accordingly and to prevent dangerous hypoglycemia." The frequency with which Jail medical staff tested Baughman's blood-glucose levels varied over the course of his detention, but it is not disputed that staff rarely measured Baughman's blood-glucose level three times in a day; on most days they did not conduct a fingerstick test at all. Between April 2014 and September 2016, on 165 days Baughman received at least two blood-glucose tests, and on 78 days he received one test; on 73 percent of days he received no fingerstick test. On multiple occasions Baughman went for extended periods without blood-glucose monitoring—up to 70 days, in the period between May and July 2015. Baughman requested additional fingerstick tests using the "sick call" request process: nine out of the ten times he requested a fingerstick test by this means it was provided. Baughman also requested fingerstick tests

---

[3] Defendant Harris County has admitted this allegation in its answer to the Fourth Amended Complaint.

from the circulating nurse—at times unsuccessfully[4]—and submitted multiple inmate complaint forms to a head nurse, some after the commencement of this litigation, complaining as a general matter about the frequency of fingerstick testing and demanding daily monitoring. The Jail did not accede to these general demands.

By February 2015, ten months after Baughman's arrival—and after this suit had commenced—Jail staff observed that he was not complying with dietary recommendations and had gained fifty pounds, now weighing 428 pounds. During a meeting on February 2, 2015, Jail dietician Cathy Rossi confronted Baughman with records of his purchases of high carbohydrate foods from the commissary. Rossi suggested better choices and encouraged diet compliance.

On March 30, 2015, Baughman submitted a letter to the Texas Commission on Jail Standards (TCJS), a body appointed by the Governor of Texas to develop rules and oversee Texas county jails. In the letter Baughman raised concerns regarding "healthcare violations and safety violations" at the Jail, including the denial of daily fingerstick testing, denial of a diabetic diet, as well as inadequate provision of storage for inmates' legal materials and unsanitary meal trays. At the time, Dr. Seale, the Jail's Executive Medical Director, was also a commissioner on the TCJS. Baughman's letter argues that Seale's dual roles posed a conflict of interest. Dr. Seale does not specifically recall reviewing Baughman's letter, but states that he probably did review it, since medical complaints were usually routed to him.

---

[4] Jail medical staff exercised discretion in granting Baughman's requests for further care in connection with diabetes management as well as several other health problems he reported, for example, chronic pain, tinnitus, potential brain tumors, potential bone cancer, and ear pain from the excessive noise generated by fellow inmates.

No. 17-20435

On April 13, 2015, on instructions from her supervisor, Health Services Division Medical Administrator Bobby Davis, Rossi imposed commissary restrictions on Baughman. These restrictions included a "low sodium" restriction—potentially tied to his hypertension—as well as a dialysis restriction and a "no solids" restriction. During an appointment at the Chronic Care Clinic on April 28, 2015, nurse practitioner Beverly Howard explained to Baughman that the restrictions had resulted from providers' observations that, notwithstanding repeated discussions of diet, Baughman's weight, blood pressure, and blood glucose were not in control. The dialysis and no-solids restrictions appear to be mismatched with Baughman's medical needs. Dr. Seale does not recall any involvement or communication regarding the commissary restrictions, and is aware of no connection between Baughman's letter and the restrictions. Neither Davis nor Rossi were aware of Baughman's letter at the time Rossi imposed the restrictions.

**D.**

On November 5, 2014, Baughman filed a complaint pro se in the district court, bringing claims against a list of twenty one officials of the Harris County Jail, including under the First and Fourteenth Amendments and 42 U.S.C. § 1983. After Baughman submitted several amendments to his claims, the district court appointed counsel, and Baughman filed a Fourth Amended Complaint. In this operative complaint, Baughman sues Harris County and diabetic caregivers at the Jail, alleging that they denied him adequate medical care, violating his rights under the Eighth and Fourteenth Amendments, and also are liable for negligent provision of medical care. Baughman also sues the County and six individual dental care providers at the Jail for their allegedly negligent and unconstitutional denial of adequate of dental care, violating his rights under the Eighth and Fourteenth Amendments. Baughman sues the County and supervisory officials at the Jail for failure to supervise and train

10

staff to provide adequate medical and dental care. Finally, Baughman sues three individual Jail officials—Seale, Davis, and Rossi—alleging they unlawfully retaliated against him for the complaint submitted to the Texas Commission on Jail Standards, violating his rights under the First and Fourteenth Amendments.

Defendants filed separate motions for summary judgment. Harris County filed a motion for summary judgment, arguing that no reasonable juror could find municipal liability on Baughman's constitutional claims and that his state-law claims were barred by sovereign immunity. Five diabetic caregivers—Seale, Guice, Davis, Lambi, and Howard—moved for summary judgment on the basis of qualified immunity. The dietician Rossi together with the dentists moved for summary judgment also asserting the defense of qualified immunity. The district court granted the motions, with the exception of the dentists' motion on the dental care claims. The parties later settled the dental care claims.

Baughman appeals the district court's grant of summary judgment on the diabetic caregivers', Harris County's, and Rossi's motions.

## II.

A movant shall prevail on summary judgment where he "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[5] A factual issue is genuine if the summary judgment record provides evidence on which a reasonable jury could return a verdict for the nonmoving party, and is material if the resolution of the issue in favor of one party might affect the outcome of the suit under governing law.[6]

---

[5] FED. R. CIV. P. 56(a).

[6] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

No. 17-20435

Where the movant demonstrates that there is no genuine issue of material fact, the non-movant bears the burden of demonstrating "specific facts showing that there is a genuine issue for trial."[7] The court reviews a district court's order granting summary judgment de novo, viewing the evidence and drawing all factual inferences from the evidence in the light most favorable to the non-movant.[8] The court construes pro se briefs liberally, though a litigant's pro se status does not relieve him of the procedural obligation to present evidence creating a genuine issue of material fact to survive summary judgment.[9]

## A.

Public officials acting within the scope of their authority generally are shielded from a suit for monetary damages by the doctrine of qualified immunity.[10] To overcome qualified immunity, a plaintiff must establish that the defendant officials violated a statutory or constitutional right and that the right was "clearly established" at the time of the violation.[11] "A good-faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available."[12]

"The constitutional rights of a pretrial detainee flow from the procedural and substantive due process guarantees of the Fourteenth Amendment."[13] "This Court has recognized that there is no significant distinction between pretrial detainees and convicted inmates concerning basic human needs such

---

[7] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[8] *Smith v. Regional Trans. Auth.*, 827 F.3d 412, 417 (5th Cir. 2016).

[9] *Perez v. Johnson*, 122 F.3d 1067, at *1 (5th Cir. 1997) (unpublished).

[10] *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

[11] *Id.*

[12] *King v. Handorf*, 821 F.3d 650, 653 (5th Cir. 2016).

[13] *Gibbs v. Grimmette*, 254 F.3d 545, 548 (5th Cir. 2001).

as medical care."[14] A pretrial detainee's due process rights are at least as great as the Eighth Amendment protections available to a convicted prisoner.[15] "The State's exercise of its power to hold detainees and prisoners . . . brings with it a responsibility under the U.S. Constitution to tend to essentials of their well-being," including an affirmative duty to provide adequate medical care.[16] Pretrial detainees may challenge the episodic acts or omissions of individual officials where these officials act with deliberate indifference.[17] A prison official acts with deliberate indifference where he or she knows of a substantial risk of serious harm to the detainee, and disregards that risk.[18] The detainee need not show that the risk was realized—that he was harmed—but only that the official subjected him to the requisite level of risk.[19] "Deliberate indifference is an extremely high standard to meet."[20] An incorrect prescription or even a "failure to alleviate a significant risk that [the official] should have perceived, but did not" is insufficient to show deliberate indifference.[21] Disagreement about medical treatment is not sufficient for a constitutional violation.[22] Rather the plaintiff must establish "that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in

---

[14] *Id.*

[15] *Hare v. City of Corinth*, 74 F.3d 633, 638–39 (5th Cir. 1996) (en banc).

[16] *Id.*

[17] *Id.* at 644–45.

[18] *Domino v. Texas Dep't of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001) (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

[19] *See id.* For this reason, we agree with Baughman that the district court erred in citing the absence of harm in its finding of no constitutional violation.

[20] *Id.* at 756.

[21] *Id.* (alteration in the original).

[22] *Varnado v. Lynaugh*, 920 F.2d 320, 321 (5th Cir. 1991).

any similar conduct that would clearly evince a wanton disregard for any serious medical needs."[23]

Baughman challenges the acts and omissions of individual medical care providers at the Jail, arguing that their failure to order thrice daily fingerstick tests exposed him to substantial risks of severe hypoglycemia, including diabetic coma or death. Individual defendants Michael Seale, Marcus Guice, Bobby Davis, Sharon Lambi, and Beverly Howard are all Jail officials who oversaw Baughman's diabetes management at the Jail. They assert the defense of qualified immunity. To survive summary judgment, Baughman must rebut the defense by establishing on the summary judgment record that a reasonable juror could find these defendants violated his constitutional rights and acted unreasonably in light of clearly established law.[24] Baughman "need not present 'absolute proof,' but must offer more than 'mere allegations.'"[25]

There is no dispute that hypoglycemia can in some situations result in serious harms such as coma and death. If Baughman had been injected with insulin indiscriminately—with complete ignorance as to his blood-glucose level—and without an ex post means of mitigating hypoglycemia, this conduct would expose him to a substantial risk of serious harm. These are not the facts of this case. Upon arrival at the Jail, Baughman was evaluated by medical staff who identified his diabetic condition, measured patterns of blood-glucose fluctuation, considered his past treatment, and on that basis prescribed a regimen of diabetes management. In the two and a half years Baughman spent at the Jail before summary judgment, Baughman received regular attention

---

[23] *Domino*, 239 F.3d at 756.

[24] *King*, 821 F.3d at 654.

[25] *Id.*

No. 17-20435

and evaluation of his diabetes management. He saw medical providers 78 times during both regularly scheduled appointments and walk-ins initiated by Baughman. On several of these occasions his insulin regimen was adjusted, each time informed by providers' observation of blood-glucose level tests, both during regularly scheduled quarterly tests and tests at other non-scheduled times. To the extent Baughman's diabetes was uncontrolled and required adjustment of the insulin regimen, the record suggests that elevated blood-glucose, not hypoglycemia, was the problem.

On over 73 percent of his days in detention between his arrival and September 2016, Baughman received no fingerstick test, a marked deviation from the optimum. To determine whether the infrequency of fingerstick testing exposed Baughman to a substantial risk of serious harm, we examine the frequency of testing in the context of the Jail's overall system of managing Baughman's diabetes. Other components of essential care as defined by Baughman's expert Madoff were indisputably present. Madoff opines "it must be possible to have staff available at all hours that are trained to perform glucose monitoring to detect and treat dangerous hypoglycemic events." The parties do not dispute that Baughman was under 24-hour surveillance, that he had 24-hour access to medical services, with security guards and triage nurses present in his cellblock in the event of a medical emergency. Jail nurses administering insulin could identify signs of hypoglycemia, even without a fingerstick test, and retained discretion to deny Baughman insulin had they observed these signs.

Madoff also observes that it was essential that Baughman have access to glucose to fend off hypoglycemia if he perceived its early symptoms, such as glucose tablets. The Jail did not supply inmates with tablets (these were kept in the clinic), but nothing in Madoff's report indicates that the Jail's provision of apples and oranges was an insufficient substitute. Nor did Baughman

15

dispute that he was able to recognize the signs of hypoglycemia—albeit with less precision than a fingerstick device—and mitigate them with sugary foods provided by the insulin cart. The record indicates as much: for example, in March 2015, Baughman refused to eat bran flakes he was served for breakfast, and then told Chronic Care Clinic staff that he felt shaky, but that he "had food/fruit given at insulin administration available for rescue if needed." Indeed, the record indicates that Baughman stockpiled sources of supplemental glucose provided by the clinic. Complementing his ability to perceive, communicate, and mitigate hypoglycemic symptoms, the record also indicates that Baughman was aware that he could refuse insulin injections, and that he exercised this option on at least one occasion.

Madoff opines it was essential for Baughman to have "the ability to instantaneously have his blood glucose assessed in the event of potential hypoglycemia." There is no dispute that the Jail provided Baughman this opportunity. Nurses administering insulin could request fingerstick tests if they suspected hypoglycemia or otherwise questioned the appropriateness of an insulin dose. Even while Baughman submitted generic grievance forms complaining about the general infrequency of fingerstick tests, he also successfully requested additional tests using the "sick call" request process. Neither Madoff's opinions nor Baughman's arguments counter Dr. Seale's position that the professional bodies' recommended frequency of tests is not generalizable to the Jail, given its 24-hour monitoring, regularity, and control of diet.

Negligence or medical malpractice do not suffice for a constitutional tort: Baughman must point us to facts upon which a jury could find defendants' "wanton disregard" for his diabetic condition. He has failed to do so. We agree with the district court that Baughman has not established facts on which a reasonable jury could find he was exposed to a substantial risk of the serious

harms associated with untreated severe hypoglycemia. The record does not support Baughman's contention that his diabetes management forced a "Hobson's Choice" between hypoglycemic "Russian roulette" and potential coma or death by hyperglycemia. We affirm the district court's determination that Baughman has established no constitutional violation, and the five individual officials prevail on summary judgment.

## B.

Municipalities can be sued directly under § 1983.[26] To succeed on a claim against a municipality, a plaintiff must demonstrate that an official policy promulgated by a municipal policymaker was the moving force behind a violation of the plaintiff's constitutional right.[27] A municipality can be liable for failure to train its employees where this failure amounts to deliberate indifference to the rights of persons with whom these employees come into contact.[28] Here, Baughman argues Harris County's official policy was the moving force behind Jail staff's constitutionally infrequent use of fingerstick tests. Additionally, Baughman argues the same constitutional violation is attributable to the County's failure to train Jail medical staff. Thus Baughman's municipal claims are premised on the same alleged constitutional violation addressed above. As with the claims against the individual Jail officials, there is no basis for Baughman's claim against Harris County. We affirm the district court's grant of summary judgment to Harris County.

## C.

To prevail on a claim for unconstitutional retaliation, the plaintiff must establish the exercise of a specific constitutional right, the defendants' intent

---

[26] *Connick v. Thompson,* 563 U.S. 51, 60 (2011).

[27] *Davidson v. City of Stafford,* 848 F.3d 384, 395 (5th Cir. 2017).

[28] *Connick,* 563 U.S. at 61.

to retaliate against him for the exercise of that right, a retaliatory act, and a causal nexus between his exercise of the right and the retaliatory act.[29] To establish causation, the plaintiff must establish that but for the retaliatory motive, the defendants' act of retaliation would not have occurred.[30] A plaintiff must "produce direct evidence of motivation" or "allege a chronology of events from which retaliation may plausibly be inferred."[31] Where defendants move for summary judgment, the plaintiff's conclusory allegations with respect to any of these four elements will not withstand the motion.[32]

Here, we need not look beyond the requirement of causation. Baughman's letter to the Texas Commission on Jail Standards was submitted on March 30, 2015 and was received on April 6, 2015. Rossi, at Davis's instruction, imposed commissary restrictions on Baughman on April 13, 2015. Baughman argues this is a chronology from which a reasonable juror could infer retaliation. He is wrong. Standing alone, the chronology does not eliminate the possibility of retaliation. But the dates cannot be viewed alone. To the extent there could have been a retaliatory motive, this would have originated from Seale, the only defendant who may have known of Baughman's letter—Seale does not remember the letter, but conceded that, as part of his role on the TCJS, he likely would have reviewed it. Though Seale, as Executive Medical Director, had authority to impose commissary restrictions, he had no involvement in the restriction imposed on Baughman. Baughman's commissary restriction was imposed by Rossi at the instruction of Davis. Neither Davis nor Rossi were aware of the letter's existence. It is unclear how

---

[29] *McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir. 1998).

[30] *Id.*

[31] *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995).

[32] *Id.*

No. 17-20435

Baughman understands the alleged retaliation to have occurred in these circumstances, but all we can conclude is that the district court was correct that on these facts no reasonable juror could find retaliation. We affirm the grant of summary judgment to Seale, Davis, and Rossi on this claim.

## D.

Baughman also brings a state-law tort claim against Harris County, arguing that the County violated the medical standard of care in its treatment of his diabetes, and is liable for the negligence of the Jail's healthcare providers. The district court held that this claim was barred by sovereign immunity, because it did not fall within the Texas Tort Claims Act's narrow statutory waiver of immunity for "personal injury . . . so caused by . . . use of tangible personal . . . property. . . if the governmental unit would, were it a private person, be liable to the claimant according to Texas law."[33] Baughman argues that the district court erred in finding his claim barred, because Jail officials' use of insulin and medical equipment constitutes a use of tangible property under the Act.

Baughman's argument fails. The district court was correct to find that the use of drugs and medical equipment while treating an inmate in its custody is not enough to satisfy the Texas Tort Claim Act's use of tangible property requirement. In *Texas Department of Criminal Justice v. Miller*, the Texas Supreme Court clarified as much: "[d]octors in state medical facilities use some form of tangible personal property nearly every time they treat a patient," but the state has not waived sovereign immunity "in every case in which medical treatment is provided by a public facility."[34] Rather, "[u]sing that property

---

[33] TEX. CIV. PRAC. & REM. CODE § 101.021(2).

[34] 51 S.W.3d 583, 588 (Tex. 2001) (quotation marks omitted).

No. 17-20435

must have actually caused the injury."[35] Baughman has not demonstrated that a reasonable juror could find that the Jail staff's use of insulin and other medical equipment caused him injury. The district court correctly granted summary judgment to the County on this claim.

## III.

Baughman has moved for appointment of counsel on appeal. Appointment is not necessary here, and the motion is denied.

## IV.

We AFFIRM the district court's grants of summary judgment on the basis of qualified immunity to individual officials Seale, Guice, Davis, Howard, and Lambi on the medical care claim; and to Seale, Davis, and Rossi on the retaliation claim; as well as the district court's grant to Harris County on claims for municipal liability and the negligence claim; and dismiss the case. Baughman's motion for appointment of counsel is DENIED.

---

[35] *Id.*